COPY

1   Amir M. Kahana, Esq. (SBN 218149)
2   Law Offices of Amir M. Kahana, P.C.
    18101 Von Karman Ave., Suite 230
3   Irvine, CA 92612
4   Telephone (949) 812-4781
    Facsimile (949) 281-2105
5   amk@kahanalaw.com

6
    Attorney for Plaintiffs THERMARK
7   HOLDINGS, INC. AND THERMARK LLC

8           UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10              SOUTHERN DIVISION

11

12   THERMARK HOLDINGS, INC. a          CASE NO.   SACV13 - 00445 AG (ANx)
13   Delaware corporation, and
     THERMARK, LLC, a Pennsylvania
14   Limited Liability Company
15                                       COMPLAINT FOR:
           Plaintiff,
16                                       (1) PATENT INFRINGEMENT
17         v.
                                         (2) BREACH OF CONTRACT
18
     LASERSKETCH LTD., an Illinois      (3) MISAPPROPRIATION OF
19   Corporation, JDS INDUSTRIES, INC.,     TRADE SECRETS
     a South Dakota Corporation,
20   PERMANENT IMPRESSIONS, INC.,        (4) UNFAIR BUSINESS PRACTICES
     a Nevada Corporation, PAUL W.
21   HARRISON, an individual, and DOES
     1 through 10, inclusive,
22
23         Defendants.
24
25
26
27
28

Plaintiffs TherMark Holdings, Inc. and TherMark, LLC bring this action for patent infringement and other claims against Defendants LaserSketch, Ltd., JDS Industries, Inc., Permanent Impressions, Inc., and Paul W. Harrison (collectively "Defendants"). Plaintiffs seek judgment that use of products used, manufactured, sold, offered for sale or imported into the United States by the Defendants have infringed or will infringe U.S. Patent Nos. 6,075,223 and 6,313,436.  Plaintiffs hereby allege the following:

**THE PARTIES**

1.      Plaintiff TherMark LLC, is a limited liability company organized and existing under the laws of Pennsylvania.

2.      Plaintiff TherMark Holding, Inc. is a corporation organized and existing under the laws of Delaware, and wholly owns TherMark, LLC.

3.      Plaintiffs TherMark LLC and TherMark Holdings (collectively "TherMark") have a principal place of business at 33 Hammond, Suite 205, Irvine, California 92618.

4.      TherMark specializes in the development, manufacture and sale of products used in laser engraving/marking images on a variety of surfaces.

5.      Defendant, LaserSketch Ltd. ("LaserSketch"), upon information and belief, is an Illinois corporation, having a principal place of business at 1319 Enterprise Drive, Romeoville, Illinois 60446.  LaserSketch is listed with the Illinois Secretary of State as also being located at 13650 Longview Drive, Homer Glen, Illinois 60491.

6.      LaserSketch is engaged in the business of, *inter alia*, developing, manufacturing, selling and distributing products to the laser engraving industry.

7.      Defendant JDS Industries, Inc. ("JDS Industries") upon information and belief, is a corporation organized and existing under the laws of South Dakota, having a principal place of business at 1800 East 57th St. North, Sioux Falls, South Dakota 57104.

8.      JDS Industries has a location and warehouse in this district at 13512 Imperial Hwy, Santa Fe Springs, California 90670.

9.     JDS Industries is in the business of distributing and selling products used in the awards industry, including laser engraving materials and supplies.

10.     Defendant Permanent Impressions, Inc. ("Permanent Impressions"), upon information and belief, is a corporation organized and existing under the laws of Nevada, and which does substantial business in this district.

11.     Defendant Paul W. Harrison, upon information and belief, is an individual that maintains a permanent residence in this district.  He is the Chief Executive Officer and Agent for Service of Process, as well as a Director and Owner, of Permanent Impressions, and transacts business through it.

12.     Harrison and Permanent Impressions previously signed a contract with a forum selection clause that designates Orange County, California as the appropriate forum for any dispute with TherMark.

13.     Upon information and belief, Harrison and Permanent Impressions are working with LaserSketch on the development, manufacturing and sale of products used in the laser engraving industry.

14.     The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs.  Plaintiffs are informed and believe, and based thereon allege, that each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein.  Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated hereinafter as DOES when such identities become known.  Plaintiffs are informed and believe, and based thereon allege, that each Defendant acted in all respects pertinent to this action as the agent of the other Defendants, carried out a joint scheme, business plan or policy in all respects pertinent hereto, and the acts of each Defendant are legally attributable to the other Defendants.

1

## JURISDICTION AND VENUE

2
3
15.     This is an action for patent infringement arising under the United States Patent Act, 35 U.S.C. § 1, *et seq.*

4
5
6
16.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367.

7
8
9
10
11
12
13
14
17.     On information and belief, this Court has personal jurisdiction over Defendants because Defendants reside in this district and because Defendants have engaged in, and made meaningful preparations to engage in, infringing conduct in violation of 35 U.S.C. § 271 in this District, and have placed infringing products into the stream of commerce through established distribution channels, and have disseminated instructional materials, with the intent, knowledge and/or understanding that such products are used and sold in this District.  These acts cause injury to TherMark within the District.

15
16
18.     Additionally, upon information and belief, the Defendants transact a large volume of business in this District.

17
18
19
20
19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), 1391(c), 1391(d), and 1400(b). Venue is also proper because the Settlement Agreement between Harrison, Permanent Impressions, and TherMark contains a forum selection clause designating Orange County, California as the appropriate venue.

21

## FACTUAL BACKGROUND

22

## THE THERMARK PATENTS

23

### U.S. Patent No. 6,075,223

24
25
26
20.     TherMark LLC is the owner of all right, title, and interest to U.S. Patent No. 6,075,223, entitled, "High Contrast Surface Marking" ("the '223 Patent").  TherMark, LLC is a wholly owned subsidiary of TherMark Holdings, Inc.

27
28

21.     TherMark LLC has full rights to sue and recover damages for all past, present, and future infringements of the '223 Patent.

22.     The '223 Patent was duly and legally issued by the United States Patent and Trademark Office on June 13, 2000.

23.     The '223 Patent issued from U.S. Patent Application No. 08/925,031, filed on September 8, 1997.

24.     A true and correct copy of the '223 Patent is attached as Exhibit A.

25.     Harrison is the inventor of the '223 Patent.

26.     Harrison assigned his entire right, title and interest in the '223 Patent to TherMark LLC.

### U.S. Patent No. 6,313,436

27.     TherMark LLC is the owner of all right, title, and interest to U.S. Patent No. U.S. Patent No. 6,313,436, entitled, "High Contrast Surface Marking" ("the '436 Patent").

28.     TherMark LLC has full rights to sue and recover damages for all past, present, and future infringements of the '436 Patent.

29.     The '436 Patent was duly and legally issued by the United States Patent and Trademark Office on November 6, 2001.

30.     The '436 Patent issued from U.S. Patent Application No. 09/477,921, filed on November 6, 2001.

31.     The '436 Patent claims priority to the '223 patent.

32.     The '436 Patent is a divisional of the '223 patent.

33.     A true and correct copy of the '436 Patent is attached as Exhibit B.

34.     Harrison is the inventor of the '436 Patent.

35.     Harrison assigned his entire right, title and interest in the '436 Patent to TherMark LLC.

36.     In 1998, Harrison assigned the entire right, title and interest to the '223 Patent, and to any all-divisional applications, including the '436 Patent, to TherMark LLC.

37.     Harrison no longer has any ownership interest in TherMark LLC, TherMark Holdings, the '223 Patent and/or the '436 Patent.

## THE INFRINGING PRODUCTS

### JDS LazerBond LZB 100 Aerosol Spray

38.     LazerBond LZB100 Aerosol Spray for Blackening Lasered Metals ("LZB100") is a product used to laser mark metals that is manufactured by LaserSketch and is used, distributed, sold and offered for sale by JDS Industries.

39.     Instruction sheets and tutorial videos for LZB100 supplied by JDS Industries provide instructions on how to use LZB100 in such a way as to infringe claims of the '223 and '436 patents.

### LaserSketch LaserGrade Bonding Materials

40.     LaserSketch manufactures, uses, sells and offers for sale a variety of products titled LaserGrade Bonding Material ("the LaserGrade Bonding Material products").

41.     The LaserGrade Bonding Material for Marking Metals products include BMM100A: Black Aerosol Spray Bonding Material for Metals Marking, BMM100: Black Marking Liquid for Metals Marking, and LaserGrade Bonding Film.

42.     The LaserGrade Bonding Material for Marking Ceramic, Glass & Stone products include LaserGrade BMC200 Liquid.

43.     Upon information and belief, Permanent Impressions and Harrison have and are using and were and are involved in the development, marketing and sale of LaserGrade Bonding Material products.

44.     LaserSketch's website provides written instructions on how to use the LaserGrade Bonding Material products in a way that infringes the '223 and '436 Patents.

45.     Upon information and belief, Harrison has provided instructions and/or instructed others how to use LZB100 and the LaserGrade Bonding Material products in a way that infringes the '223 and '436 Patents, including by having conversations and/or by providing demonstrations and/or written comments on internet industry forums.

46.     Upon information and belief, LaserSketch and Harrison have each provided instructions and/or instructed others how to use LZB100 product in a way that infringes the '223 and '436 Patents and LaserSketch and LaserSketch and Harrison have each provided instructions and/or instructed others how to use LaserGrade Bonding Material products in a way that infringes the '223 and '436 Patents, including by having conversations and/or by providing demonstrations and/or written instructions sheets and continue to do so.

47.     The Defendants are liable for direct, induced and contributory infringement because they, as well as their customers, use these products to practice the claimed invention, because the Defendants knowingly induced others to infringe the patents and because the Defendants sold the accused products knowing they constitute a material part of the claimed inventions and have no substantial non-infringing uses.

48.     Use of the Defendants' products for laser marking metals, ceramic, glass and/or plastic in their customary and intended manner infringes numerous patent claims based on the plain language of those claims.

49.     There has also been direct infringement by the Defendants themselves, as well as those customers who have used and will continue to use the accused products unless enjoined.  Each of the Defendants has knowledge of the patents-in-suit and have actively aided and abetted infringement.  Moreover, the Defendants have provided instructions to others on how to use the accused products in such a way that infringes the patents-in-suit.

50.     Finally, there are no substantial non-infringing uses of the accused products. Use of the accused products in the their intended manner will infringe at least one claim of the '223 or the '436 patents.

## HARRISON'S HISTORY WITH THERMARK

51.     In 1996, Harrison founded TherMark LLC to develop laser-marking technology.  Harrison developed a number of inventions in the field of laser marking, including the inventions that gave rise to the '223 and '436 Patents, and started licensing the intellectual property and selling marking materials used in this technology.

52.     By late 2005, however, Harrison and his company were underwater and owed creditors in excess of $700,000.  Harrison began presenting his company and products to investors willing to infuse the company with cash.

53.     In order to prepare for the investment, Harrison assigned all of his rights, title and interests in TherMark, LLC to TherMark Holdings on or about March 31, 2006. Between 2006 and 2009, Harrison obtained over $3 million in investments in TherMark from about 60 investors.

54.     On or about April 21, 2006, as part of the initial approximately $1.7 million investment, Harrison agreed that for the next four years he would continue to drive the company's product innovation, including the development of color technology.  At the time Harrison was TherMark's Chief Technology Officer ("CTO") and Secretary.

55.     Additionally, as part of the 2006 financing, Harrison entered into a Confidential Information and Invention Assignment Agreement ("Invention Assignment Agreement").  Attached hereto as Exhibit C, and incorporated herein in full, is a true and correct copy of the Invention Assignment Agreement.

56.     Pursuant to the Invention Assignment Agreement, Harrison agreed as consideration of his engagement by TherMark:

[A]ll my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs,

discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am engaged as a consultant by TherMark.

57.    The Invention Assignment Agreement covers all inventions by Harrison during the time he was engaged by TherMark, which was April 2006 through May 2009.

58.    Within several months, disputes arose between Harrison and TherMark's management and board.  As a result, TherMark's Board decided in mid-2007 that it was in the best interest of all parties to terminate Harrison's services as Chief Technology Officer ("CTO") and Secretary.  However, Harrison would still continue to provide consulting and advisory services to TherMark, and remained on its Board of Directors.

59.    In order to avoid litigation, TherMark entered into a Separation Agreement and Mutual Releases (the "Separation Agreement") with Harrison and Permanent Impressions on July 31, 2007.  In the Separation Agreement, TherMark agreed to pay Permanent Impressions $13,500 per month, for Harrison's services to lead TherMark's Research and Development efforts.  Attached hereto as Exhibit D, and incorporated herein in full, is a true and correct copy of the Separation Agreement.

60.    Despite the releases contained within the Separation Agreement, Harrison hired an attorney in 2008 and again threatened to bring legal claims against TherMark.

61.    After negotiations between TherMark and Harrison's attorneys, on April 28, 2008, TherMark entered into a Consulting Agreement (the "Consulting Agreement") with Harrison and Permanent Impressions that paid $10,000 per month until May 27, 2009. Attached hereto as Exhibit E, and incorporated herein in full, is a true and correct copy of the Consulting Agreement.

62.     Between 2006 and May 2009, Harrison was paid approximately $572,414 to act as TherMark's Chief Technology Officer, and later to provide Research and Development services pursuant to the Consulting Agreement.

63.     On November 17, 2009, Harrison filed a lawsuit against TherMark and others alleging breach of fiduciary duties; negligent misrepresentation; attorney negligence; breach of contract; deceit and conversion.

64.     TherMark counterclaimed and in February 2011 filed a second action against Harrison and companies he was working with at the time, including Permanent Impressions, because Harrison had formed a competing company while sitting on TherMark's Board of Directors.  TherMark obtained a Temporary Restraining Order against Harrison, and before the hearing on the Preliminary Injunction, Harrison resigned from the Board of Directors of TherMark.  TherMark maintained claims for breach of fiduciary duties; breach of contract; interference with contract; interference with prospective business advantage; misappropriation of trade secrets; and declaratory relief.

65.     On or about March 31, 2011, the litigation with Harrison was resolved through the TherMark Stock Redemption and Settlement Agreement ("Settlement Agreement").  Pursuant to the Settlement Agreement, TherMark redeemed all of Harrison's outstanding shares of stock. Attached hereto as Exhibit F, and incorporated herein in full, is a true and correct copy of the Settlement Agreement.

66.     In Paragraph 14 of the Settlement Agreement, Harrison further agreed that he would not:

> [E]nter into any agreement with, service, assist or solicit, market or sell any product, technology, or equipment, to any of the entities listed in Schedule II, or to their affiliates, anywhere in the world for a period of 3 years from the Effective date of this Agreement.

67.    The Settlement Agreement further provided that it shall be governed, construed and interpreted in accordance with the laws of the State of California and any claims arising from the Agreement shall be brought in Orange County.

## Harrison's Disregard of His Contracts With TherMark

68.    By the express terms of the Invention Assignment Agreement, which Harrison executed on or about April 21, 2006 and was an integral part of his engagement with TherMark that lasted until April 2009, Harrison assigned to TherMark all right, title and interest in:

> "[A]ll inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am engaged as a consultant by TherMark. . . I understand and agree that the decision whether or not commercialize or market any invention developed by me solely or jointly with others is within TherMark's sole discretion and for TherMark's sole benefit . . . ."

69.    Upon information and belief, Harrison in violation of the Invention Assignment Agreement has been and continues to actively work on, develop and use inventions, concepts, technology and/or patents that are based on the research and development that Harrison, as head of TherMark's research and development worked on during his engagement with TherMark.  Such conduct is also unauthorized use and disclosure of TherMark's trade secrets.

70.    As the head of TherMark's research and development Harrison received substantial sums of money and was fully aware that all inventions, concepts, technology and/or patents developed while engaged at TherMark were assigned to TherMark.

71.    Thus, pursuant to the Invention Assignment Agreement all inventions, concepts, technology and/or patents based on research and development done while Harrison was engaged at TherMark properly belong to TherMark, not Harrison.

72.    Additionally, pursuant to the Invention Assignment Agreement, Harrison also agreed during the term of his engagement by TherMark and thereafter to:

> "[H]old in strictest confidence, and not to use, except for the benefit of TherMark, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of TherMark, and Confidential Information of TherMark"

73.    The Invention Assignment Agreement defined "Confidential Information" as:

> Non-public information that relates to the actual or anticipated business or research and development of TherMark, technical data, trade secrets, or know-how, including, but not limited to, research, product plans or other information regarding TherMark's products or services and markets therefore, customer lists and customers (including, but not limited to, customers of TherMark on whom I called or with whom I became acquainted during the term of my engagement as a consultant by TherMark), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information."

74.    TherMark has made reasonable efforts to ensure that its trade secrets and confidential information remain secret by instituting internal company policies and procedures regulating the access to, designation of, and dissemination of its proprietary and confidential information, including but not limited to, requiring, as a condition of any employment by TherMark, that its employees and/or consultants enter into agreements

1  such as the Invention Assignment Agreement that protects the confidential information

2  and trade secrets from use and/or disclosure.

3      75.    Further, in executing the Settlement Agreement with TherMark, in which

4  TherMark redeemed Harrison's outstanding shares of TherMark stock and both parties

5  dismissed the pending lawsuits, a significant provision of the consideration for the

6  Settlement Agreement was Harrison's and Permanent Impressions' agreement not to

7  service, assist or solicit, market or sell any product, technology, or equipment for 3 years

8  to specifically identified customers of TherMark.

9      76.    Upon information and belief, Harrison and Permanent Impressions have

10  breached the Settlement Agreement by soliciting at least one, and likely more, TherMark

11  customers that were specifically identified, and agreed to in the Settlement Agreement, as

12  restricted customers to which Harrison would not solicit.  Such conduct is also

13  unauthorized use and disclosure of TherMark's Confidential Information.

14      77.    Additionally, upon information and belief, Harrison and Permanent

15  Impressions are attempting to circumvent their non-solicitation agreement by having JDS

16  and/or LaserSketch solicit TherMark's customers.

17  **FIRST CLAIM FOR RELIEF**

18  **(Infringement of the '223 Patent against LaserSketch, JDS Industries and Harrison)**

19      78.    TherMark incorporates by reference and realleges the paragraphs above as

20  though fully reinstated herein.

21      79.    On information and belief, LaserSketch, JDS Industries and Harrison have

22  infringed and continue to infringe one or more of the claims of the '223 Patent by using,

23  selling, and/or offering to sell within the United States, and/or by importing into the

24  United States, products used for laser marking, including without limitation (with respect

25  to LaserSketch and Harrison) LaserGrade Bonding Material products, such as

26  LaserGrade BMM100A aerosol spray, LaserGrade BMM100 liquid, LaserGrade

27

28

BMM200 liquid, LaserGrade Bonding film and (with respect to LaserSketch, Harrison and JDS Industries) LazerBond LZB100 Aerosol Spray Can.

80.     LaserSketch, JDS Industries and Harrison, as well as their customers, infringe the '223 patent through the normal use of the accused products.

81.     LaserSketch, JDS Industries and Harrison are liable for their infringement of the '223 Patent pursuant to 35 U.S.C. § 271.

82.     On information and belief, LaserSketch, JDS Industries and Harrison have induced, and continue to induce, others to infringe one or more claims of the '223 Patent in violation of 35 U.S.C. § 271 by knowingly taking active steps to encourage and facilitate direct infringement by others, such as sellers, distributors and/or users of the infringing products, with knowledge of that infringement, such as by contracting for the distribution of the infringing product, by marketing the infringing products, and/or by creating and/or distributing videos, pamphlets, flyers, displays, instruction sheets, websites and/or similar materials providing guidance on how to use the infringing products.

83.     On information and belief, LaserSketch, JDS Industries and Harrison have contributorily infringed, and continue to contributorily infringe, the '223 Patent in violation of 35 U.S.C. § 271, by selling or offering for sale within the United States, and/or importing into the United States the accused products, which embody a material part of the inventions described in one or more of the claims of the '223 Patent, that are known by Defendants to be specially made or specially adapted for use in infringement of one or more of the claims of the '223 Patent, and that are not staple articles or commodities suitable for substantial, non-infringing use.

84.     LaserSketch, JDS Industries and Harrison have been put on notice of the '223 Patent and its infringement thereof before the filing of this Complaint.

85.     LaserSketch, JDS Industries and Harrison have had actual and constructive knowledge of the '223 Patent.

86.     On information and belief, others, including the customers of LaserSketch, JDS Industries and Harrison, have infringed the '223 Patent by using one or more of the accused products.

87.     Pursuant to 35 U.S.C. § 284, TherMark is entitled to damages adequate to compensate for the infringement, including lost profits but in no event less than a reasonable royalty.

88.     LaserSketch, JDS Industries and Harrison' infringement of the '223 Patent has been and is willful and, pursuant to 35 U.S.C. § 284, TherMark is entitled to treble damages.

89.     TherMark has been irreparably harmed by these acts of infringement, and will continue to be harmed unless and until LaserSketch, JDS Industries and Harrison acts of infringement are enjoined and restrained by order of this Court.

90.     This case is "exceptional" within the meaning of 35 U.S.C. § 285, and TherMark is entitled to an award of attorneys' fees.

## SECOND CLAIM FOR RELIEF

### (Infringement of the '436 Patent Against all Defendants)

91.     TherMark incorporates by reference and realleges the paragraphs above as though full restated herein.

92.     On information and belief, LaserSketch, JDS Industries and Harrison have infringed and continue to infringe one or more of the claims of the '436 Patent by using, selling, and/or offering to sell within the United States, and/or by importing into the United States, products used for laser marking, including without limitation (with respect to LaserSketch and Harrison) LaserGrade Bonding Material products, such as LaserGrade BMM100A aerosol spray, LaserGrade BMM100 liquid, LaserGrade BMM200 liquid, LaserGrade Bonding film and (with respect to LaserSketch, Harrison and JDS Industries) LazerBond LZB100 Aerosol Spray Can.

93.     LaserSketch, JDS Industries and Harrison, as well as their customers, infringe the '436 patent through the normal use of the accused products.

94.     LaserSketch, JDS Industries and Harrison are liable for their infringement of the '436 Patent pursuant to 35 U.S.C. § 271.

95.     On information and belief, LaserSketch, JDS Industries and Harrison have induced, and continue to induce, others to infringe one or more claims of the '436 Patent in violation of 35 U.S.C. § 271 by taking active steps to encourage and facilitate direct infringement by others, such as sellers, distributors and/or users of the infringing products, with knowledge of that infringement, such as by contracting for the distribution of the infringing product, by marketing the infringing products, and/or by creating and/or distributing videos, pamphlets, flyers, displays, instruction sheets, websites and/or similar materials providing guidance on how to use the infringing products.

96.     On information and belief, LaserSketch, JDS Industries and Harrison have contributorily infringed, and continue to contributorily infringe, the '436 Patent in violation of 35 U.S.C. § 271, by selling within the United States, offering for sale within the United States, and/or importing into the United States components that embody a material part of the inventions described in one or more of the claims of the '436 Patent, that are known by LaserSketch, JDS Industries and Harrison to be specially made or specially adapted for use in infringement of one or more of the claims of the '436 Patent, and that are not staple articles or commodities suitable for substantial, non-infringing use.

97.     LaserSketch, JDS Industries and Harrison have been put on notice of the '436 Patent and its infringement thereof before the filing of this Complaint.

98.     LaserSketch, JDS Industries and Harrison have had actual and constructive knowledge of the '436 Patent.

99.     On information and belief, others, including the customers of LaserSketch, JDS Industries and Harrison, have infringed the '436 Patent by using one or more of the accused products.

100.   Pursuant to 35 U.S.C. § 284, TherMark is entitled to damages adequate to compensate for the infringement, including lost profits but in no event less than a reasonable royalty.

101.   Defendants' infringement of the '436 Patent has been and is willful and, pursuant to 35 U.S.C. § 284, TherMark is entitled to treble damages.

102.   TherMark has been irreparably harmed by LaserSketch, JDS Industries and Harrison' acts of infringement, and will continue to be harmed unless and until LaserSketch, JDS Industries and Harrison' acts of infringement are enjoined and restrained by order of this Court.

103.   This case is "exceptional" within the meaning of 35 U.S.C. § 285, and TherMark is entitled to an award of attorneys' fees.

### THIRD CLAIM FOR RELIEF

**(Breach of Contract Against Harrison and Permanent Impressions)**

104.   TherMark incorporates by reference and realleges the above as though full restated herein.

105.   TherMark entered into valid written contracts with Harrison and Permanent Impressions, which are attached hereto as Exhibits C to F and fully incorporated herein (collectively the "Contracts").

106.   TherMark has performed, or substantially performed, all of the requirements of the Contracts, or was excused from performance.

107.   All conditions required for Harrison and Permanent Impressions' performance have occurred.

108.   Under the terms of the Invention Assignment Agreement, Harrison agreed to "assign to TherMark, . . . all my right, title, and interest in and to any and all inventions".

109.   Upon information and belief, Harrison has breached the Invention Assignment Agreement by actively working on, developing and using inventions that are the same as those Harrison worked on as head of TherMark's research and development,

for which he was paid substantial sums of money by TherMark, and therefore, properly belong to TherMark not Harrison.

110.   Under the terms of the Settlement Agreement, Harrison and Permanent Impressions agreed not to "service, assist or solicit, market or sell any product, technology, or equipment to any of the entities listed in Schedule II".

111.   Upon information and belief, Harrison and Permanent Impressions have breached the Settlement Agreement by soliciting TherMark customers that were specifically identified, and agreed to, in the Settlement Agreement, as restricted customers on Schedule II.

112.   As a direct, proximate, and legal result of Harrison and Permanent Impressions' breach of contract, TherMark suffered great and irreparable harm and continues to suffer loss and general and special damages as alleged above which will be shown by proof at the time of trial, plus interest at the maximum legal rate thereon.

113.   Upon information and belief, Harrison and Permanent Impressions have derived, received, and will continue to derive and receive from the aforesaid breach of contract, gains, profits, and advantages, many of which are not presently known to TherMark.

114.   TherMark is also entitled to recover costs and attorneys' fees incurred in bringing this action to enforce its rights pursuant to the Contracts.

## FOURTH CLAIM FOR RELIEF

### (Misappropriation of Trade Secrets Against Harrison)

115.   TherMark incorporates by reference and realleges the paragraphs above as though full restated herein.

116.   In connection with its business, TherMark has developed and used trade secrets and confidential information including, but not limited to the identity of its customers and its research and development, improvements, designs, discoveries, and inventions of technology in the laser marking industry.

117.   Prior to the acts complained of herein, TherMark's trade secrets and Confidential Information had, and continue to have, economic value deriving from the fact that such information is not generally known to the public or TherMark's competitors, who could obtain economic value from its use and disclosure.

118.   TherMark has made reasonable efforts to ensure that its trade secrets and Confidential Information remain secret by instituting internal company policies and procedures regulating the access to, designation of, and dissemination of its proprietary and confidential information.  For instance, among other things, TherMark requires, as a condition of any employment by TherMark, that its employees and/or consultants enter into agreements such as the Invention Assignment Agreement entered into by Harrison referred to above which protects the Confidential Information and trade secrets from use and/or disclosure.

119.   TherMark is informed and believes, and thereon alleges that Harrison, without permission or authorization from TherMark, knowingly misappropriated the above-described Confidential Information and trade secrets, and misappropriated such confidential information and trade secrets for Harrison's own personal gain.

120.   Harrison knowing and intentional acts are in violation of the California Uniform Trade Secrets Act, California Civil Code § 3426, et seq.

121.   As a proximate result of the Harrison's misappropriation of TherMark's trade secrets as alleged above, TherMark has suffered actual damages in an amount subject to proof at trial.  As a further proximate result of the misappropriation of TherMark's Confidential Information and trade secrets, TherMark is informed and believes that Harrison has been unjustly enriched.  The amount of this unjust enrichment cannot be presently ascertained, but will be proven at the time of trial.

122.   In the event that neither TherMark's actual damages nor Harrison's unjust enrichment are subject to proof, TherMark is entitled to a reasonable royalty from

transactions entered into by Harrison as a result of the use of TherMark's trade secrets, as provided by California Civil Code § 3426.3.

123.   TherMark is informed and believes and thereon alleges that the aforementioned acts of Harrison were willful and malicious in that Harrison committed such acts with the intent to injure TherMark's business and to increase his own success in the same business with conscious disregard for TherMark's rights, thereby warranting an award of punitive damages in an amount appropriate to punish Harrison and deter others from engaging in similar misconduct.

124.   The wrongful conduct of Harrison in misappropriating TherMark's trade secrets, unless and until enjoined and restrained by order of this Court, will cause great and irreparable injury to TherMark's business in that TherMark is in grave danger of losing customers and other business relationships to such an extent that if Harrison's misconduct is not enjoined and restrained, TherMark's business will be irreparably harmed.

125.   TherMark has no adequate remedy at law for injuries currently being suffered in that Harrison will continue to use TherMark's misappropriated trade secrets and TherMark would be required to commence and maintain a multiplicity of legal proceedings to protect its interests.

126.   TherMark is informed and believes, and on that basis alleges, that Harrison's misappropriation of TherMark's trade secrets was willful and malicious, thereby entitling TherMark to recover its attorneys' fees as the prevailing party pursuant to California Civil Code § 3426.4.

## FIFTH CLAIM FOR RELIEF

### (Unfair Business Practices – California
### Bus. & Prof. Code § 17200 Against Harrison)

127.   TherMark incorporates by reference and realleges the paragraphs above as though full restated herein.

128.   Harrison engaged in, and continues to engage in, unlawful, unfair and fraudulent business practices in California in violation of the Unfair Competition Law, Bus. & Prof. Code §§ 17200 et seq. as alleged herein.

129.   Harrison's conduct in continuing to use TherMark's trade secrets to develop competing laser marking technology constitutes unfair competition.

130.   Harrison's conduct in continuing to solicit TherMark's customers, which are a protectable trade secret, constitutes unfair competition.

131.   Moreover, Harrison's solicitation of TherMark customers in violation of the Settlement Agreement constitutes unlawful business competition.

132.   By reason of Harrison's actions, Harrison has irreparably injured TherMark's business, and such injury will continue unless enjoined by this Court.

133.   Upon information and belief, Harrison has derived, received, and will continue to derive and receive from the aforesaid acts of unfair competition gains, profits, and advantages, many of which are not presently known to TherMark.  By reason of the aforesaid acts of unfair competition, TherMark has been, and will continue to be, greatly damaged in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff TherMark respectfully requests the requests the following relief:

1.   A preliminary injunction enjoining the continuing infringement of the patents-in-suit by Defendants and, additionally, enjoining any and all such other persons that are making, importing, offering for sale, selling, and using the infringing products as joint and/or contributory infringer;

2.   A judgment that LaserSketch has infringed, induced others to infringe, and/or contributorily infringed each of the '223 and '436 patents;

3.     A judgment that JDS has infringed, induced others to infringe, and/or contributorily infringed each of the '223 and '436 patents;

4.     A judgment that Paul W. Harrison has infringed, induced others to infringe, and/or contributorily infringed each of the '223 and '436 patents;

5.     A permanent injunction pursuant to 35 U.S.C. 283, enjoining the Defendants from further infringement of the patents-in-suit, and enjoining any and all such other persons that are making, importing, offering for sale, selling, and using the infringing products as joint and/or contributory infringer;

6.     Order an accounting of damages from Defendants' infringement;

7.     An award of enhanced damages, up to and including trebling the damages awarded to TherMark pursuant to 35 U.S.C. § 284 for Defendants' willful and deliberate infringement of the TherMark Patents;

8.     Award TherMark their costs of suit and reasonable attorneys' fees pursuant to 35 U.S.C. § 285 due to the exceptional nature of this case, or as otherwise permitted by law;

9.     For a preliminary and/or permanent injunction enjoining Permanent Impressions and Paul Harrison from soliciting TherMark customers in violation of the parties' agreements;

10.     For a preliminary and/or permanent injunction enjoining Permanent Impressions and Paul Harrison from using, disclosing, or otherwise misappropriating the inventions and developments assigned to TherMark;

11.     For general and special damages, according to proof at trial;

12.     For compensatory damages, consequential damages, restoration, rescission, and restitution;

13.     For an award of prejudgment and post-judgment interest accruing at the maximum legal rate thereon;

1    14.    For attorneys' fees and costs of suit incurred herein insofar as they may be

2  allowed by any contract, statute, or law; and

3    15.    For such other and further relief as the Court deems just and proper.

4

5  DATED:  March 18, 2013                    **LAW OFFICES OF AMIR M. KAHANA, P.C.**

6

7                              By: _____

8                                   AMIR M. KAHANA
                                     Attorneys for Plaintiffs THERMARK
9                                    HOLDINGS, INC. AND THERMARK, LLC

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A



US006075223A

# United States Patent [19]

## Harrison

[11] **Patent Number:** **6,075,223**

[45] **Date of Patent:** **Jun. 13, 2000**

[54] **HIGH CONTRAST SURFACE MARKING**

[75] Inventor: **Paul Wollcott Harrison**, Los Angeles, Calif.

[73] Assignee: **Thermark, LLC**, Pittsburgh, Pa.

[21] Appl. No.: **08/925,031**

[22] Filed: **Sep. 8, 1997**

[51] Int. Cl.[7] .................................................. **B23K 26/00**

[52] U.S. Cl. ...................... **219/121.85**; 347/224; 427/555

[58] Field of Search ...................................... 427/554, 555, 427/556; 219/121.69, 121.61, 121.85, 121.67; 430/346, 200, 945; 65/30.11; 347/224, 247; 346/135.1

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,945,318 | 3/1976 | Landsman | 430/200 |
| 3,962,513 | 6/1976 | Eames | 430/200 |
| 4,306,012 | 12/1981 | Scheve . | |
| 4,327,283 | 4/1982 | Heyman et al. | 235/487 |
| 4,515,867 | 5/1985 | Bleacher et al. | 428/204 |
| 4,541,340 | 9/1985 | Peart et al. | 101/470 |
| 4,651,313 | 3/1987 | Guez . | 369/14 |
| 4,769,310 | 9/1988 | Gugger et al. | 430/346 |
| 4,847,181 | 7/1989 | Shimokawa | 430/297 |
| 4,854,957 | 8/1989 | Borrelli et al. | 65/30.11 |
| 4,856,670 | 8/1989 | Hang . | |
| 4,861,620 | 8/1989 | Azuma et al. | 427/53.1 |
| 4,912,298 | 3/1990 | Daniels et al. | 219/121.69 |
| 5,030,551 | 7/1991 | Herren et al. | 430/495 |
| 5,035,983 | 7/1991 | Kiyonari et al. | 346/135.1 |
| 5,061,341 | 10/1991 | Kildal et al. | 156/632 |
| 5,075,195 | 12/1991 | Babler et al. | 430/200 |
| 5,175,425 | 12/1992 | Spratte et al. | 347/224 |
| 5,359,176 | 10/1994 | Balliet, Jr. et al. | 219/121.67 |
| 5,397,686 | 3/1995 | Dominick et al. | 430/344 |
| 5,409,742 | 4/1995 | Arfsten et al. | 427/555 |
| 5,427,825 | 6/1995 | Murnick | 427/555 |
| 5,523,125 | 6/1996 | Kennedy et al. | 427/555 |
| 5,543,269 | 8/1996 | Chatterjee et al. | 430/346 |
| 5,554,335 | 9/1996 | Fields et al. | 264/400 |
| 5,609,778 | 3/1997 | Pulaski et al. | 219/121.69 |
| 5,637,244 | 6/1997 | Erokhin | 219/121.69 |
| 5,719,372 | 2/1998 | Togari et al. | 219/121.61 |
| 5,734,412 | 3/1998 | Hasebe et al. | 347/247 |
| 5,740,941 | 4/1998 | Lemelson | 220/454 |
| 5,760,367 | 6/1998 | Rosenwasser et al. | 219/121.69 |
| 5,761,111 | 6/1998 | Glezer | 365/106 |
| 5,767,483 | 6/1998 | Cameron et al. | 219/121.85 |
| 5,783,507 | 7/1998 | Sakoske | 501/17 |
| 5,801,356 | 9/1998 | Richman | 219/121.69 |
| 5,804,342 | 9/1998 | Paz-Pujalt et al. | 430/19 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 0 419 377 A1 | 9/1990 | European Pat. Off. . |
| 0 531 584 A1 | 3/1991 | European Pat. Off. . |
| 0761377A1 | 8/1996 | European Pat. Off. . |
| 0 782 933 A1 | 12/1996 | European Pat. Off. . |
| 0716 135 A1 | 12/1996 | European Pat. Off. . |
| 201136 | 9/1981 | German Dem. Rep. . |
| 215 776 A1 | 11/1984 | Germany . |
| 35 39 047 A1 | 10/1986 | Germany . |
| 62-223940 | 10/1987 | Japan . |
| 63-216790 | 9/1988 | Japan . |
| 1-194235 | 8/1989 | Japan | 427/554 |
| 5-138114 | 6/1993 | Japan | 427/554 |
| 6-106378 | 4/1994 | Japan . |
| 2 227 570 | 1/1990 | United Kingdom . |
| WO 95/13195 | 5/1995 | WIPO . |
| WO/963221 | 10/1996 | WIPO . |

### OTHER PUBLICATIONS

Authors: Karheinz Hahn, Claudia Buerhop, and Rudolf Weißmann Title: "Finring PbO–free glass enamels using the cw–CO2 laser".

International Searching Authority, International Search Report, Aug. 9, 1989, 9 pages total.

*Primary Examiner*—Geoffrey S. Evans

[57] **ABSTRACT**

A method of laser marking metals, plastics, ceramic materials, glazes, glass ceramics, and glasses of any desired form, which comprises applying to the material to be marked a variable thickness layer of marking material containing energy absorbing enhancers then irradiating said layer with a laser or diode based energy source such that the radiation is directed onto said layer in accordance with the form of the marking to be applied, and using a laser or diode based energy source of a wavelength which is sufficiently absorbed by the marking material so as to create a bonding of the marking material to the surface of the workpiece at the irradiated areas.

**34 Claims, 13 Drawing Sheets**



Case 8:13-cv-00445-AG-AN   Document 1   Filed 03/18/13   Page 26 of 104   Page ID #:26



# FIG. 1



# FIG. 2



# FIG. 3

**U.S. Patent**          Jun. 13, 2000          Sheet 4 of 13          **6,075,223**



1234567890

# FIG. 4



# FIG. 5



FIG. 6



# FIG. 7



P TYPE



FIG. 8

U.S. Patent                  Jun. 13, 2000          Sheet 9 of 13              6,075,223

# Fig. 9

| Substrate Material | Marking Material | Beam Speed | Power (watts) | Freq (Khz/CW) |
|---|---|---|---|---|
| Aluminum | Mixed Metal Oxide | 200mm/sec | 5 watts | CW |
| Aluminum | Glass Frit | 250mm/sec | 5 watts | CW |
| Brass | Mixed Metal Oxide | 200mm/sec | 5 watts | CW |
| Ceramic | Glass Frit | 200mm/sec | 5 watts | CW |
| China | Glass Frit | 200mm/sec | 5 watts | CW |
| Copper | Mixed Metal Oxide | 100mm/sec | 5 watts | 20 KHz |
| Auto Safety Glass | Glass Frit | 200mm/sec | 5 watts | CW |
| CRT Display Glass | Glass Frit | 200mm/sec | 5 watts | CW |
| Flat Panel Display Glass | Glass Frit | 200mm/sec | 5 watts | CW |
| Microscope Slide Glass | Glass Frit | 200mm/sec | 5 watts | CW |
| Nickel | Mixed Metal Oxide | 200mm/sec | 5 watts | CW |
| Nylon™ | Mixd Metal Oxides | 250mm/sec | 5 watts | CW |
| Porcelain | Glass Frit | 200mm/sec | 5 watts | CW |
| PVC | Mixed Organic Pigments | 200mm/sec | 5 watts | CW |
| Stainless Steel | Mixed Metal Oxide | 200mm/sec | 5 watts | CW |
| Stainless Steel | Glass Frit | 300mm/sec | 5 watts | CW |
| Teflon™ | Mixed Metal Oxides | 200mm/sec | 5 watts | CW |
| Tin | Mixed Metal Oxide | 200mm/sec | 5 watts | CW |
| Titanium | Mixed Metal Oxide | 200mm/sec | 5 watts | CW |



FIG.10



*FIG. 11a*



*FIG. 11b*



*FIG. 11c*



FIG. 11d

6,075,223

1

# HIGH CONTRAST SURFACE MARKING

## FIELD OF INVENTION

The present invention relates to a method of producing permanent, enhanced contrast and/or color markings formed as a new marking layer on top of substrates including glass, ceramic, porcelain, metal, and plastic. A laser beam irradiates a marking medium having a glass frit containing an energy absorbing enhancer, or alternatively the marking medium can be a mixed metal oxide or a mixed organic pigment.

## BACKGROUND OF THE INVENTION

The marking of ceramic materials, glazes and glasses can be effected by conventional marking and decoration methods such as etching, cutting, engraving, grinding or by applying a glass or glaze colorant. In these methods, the surface of the marked material is altered with the consequence that the material may suffer damage, especially if marking is effected by etching, engraving, or cutting. The application of a glass or glaze colorant necessitates, in addition, a second firing step. The markings so produced are not always satisfactory in all respects.

It is also known to mark glass by means of a laser beam, whereas the known methods are based on melting or removing substrate material such that the surface of the marked material is also altered.

German Offenlegungsschrift 3 539 047 postulates a method of decorating, marking, and engraving enameled objects using laser beams by incorporating into the enamel coating opacifying agents which the laser beam causes to decompose optically and locally; for example, oxides of titanium, tin, cerium, and antimony. A drawback of this method is that, for example, transparent enameled objects cannot be marked because the opacifying agent incorporated in the enamel coating does not change optically at the non-irradiated areas and, therefore, strongly influences the overall appearance of the object. Furthermore, the opacifying agent employed may adversely affect the mechanical properties of the enamel.

Industry has sought to surface mark glass, ceramic, porcelain, metal, plastics, and the like with four physical attributes. These four attributes are high-resolution, high-contrast, permanence, and speed.

Well known efforts to date have only produced two or three of these attributes. For example, kiln marking ceramics using glass frit material at kiln temperatures ranging from 100° to 1000° C. results in high-resolution, high-contrast, permanent indicia on ceramics, glass, and metals. These known processes require heating the entire substrate along with the glass frit or metal oxide marking material in a kiln. The problem with these processes is the time factor and energy consumption are not commercially efficient to create the indicia. Time factors ranging from minutes to hours are common. Energy consumption of a kiln is generally measured in kilowatts per ton and/or BTUs per pound. Furthermore, these processes do not lend themselves to portability.

Another known marking method is peening on metal. This method cannot be used on glass, ceramic, or other brittle materials because of surface damage and/or breakage. Where used, this method produces a high-resolution, permanent, fast surface indicia. However, high contrast marks are not produced.

Other known marking methods are ink printing methods. One state of the art transfer printing method is taught by WO

2

95/13195 (May 1995) to Meneghine et al. assigned to Markem Corporation. These methods use a laser-transferable ink on a plastic carrier. The ink is mixed in a transfer medium solution in order to enhance the conversion of laser (IR) energy to heat. These methods produce a high-resolution, high-contrast, and relatively fast method. There is a UV cure step which is time consuming. The problem with this and all ink methods is a lack of permanence. Acids and other solvents remove ink from a hard surface. This method teaches curing the ink onto the substrate surface. The present invention teaches bonding a marking medium to form a new marking layer atop the substrate surface rather than transferring an ink to the substrate and then curing the ink.

Another well known marking method teaches the use of ink jet printers. In order to improve application performance, appearance and permanence, environmentally hazardous solvents are mixed with the ink. Even with these hazardous solvents however, significant improvement has not been achieved.

U.S. Pat. No. 4,541,340 (1985) to Peart et al. discloses a printing process for marking fabrics or plastics in a permanent image. Sublimable dyes are used such as nitroso dyes. A diffusion of the dyestuff into the substrate is caused by a pressurized air step on a transfer label. Only application to fabrics and plastics is taught. The chemistry is different from the present invention. However, the result of a permanent high contrast mark is claimed.

Another related group of marking methods is laser combined with glass frit or metal oxide marking mediums. U.S. Pat. No. 4,769,310 (1988) to Gugger et al. teaches first creating a glaze in a kiln process. The glaze has a radiation sensitive additive in amounts ranging from 0.01 to 30% by weight. This glaze is then irradiated by a beam of Nd:YAG pulsed laser having light pulses of six to eight nanoseconds at a wavelength of 0.532 μm and a pulse content of 250 milli-joules. The problem with this method is the burden of creating a time consuming glaze surface before applying the high-speed laser beam.

U.S. Pat. No. 5,030,551 (1991) to Herren et al. teaches a laser-based method to mark ceramic materials, glazes, glass ceramics, and glasses by first applying to a workpiece a 100 to 10,000 Angstrom thick transparent layer of titanium dioxide. Second, the workpiece is fired in an oven at 620° C. for one minute and then slowly cooled in the closed oven. Third, the layer is irradiated with a pulsed laser in accordance with the form of the marking to be applied. The laser light must have a wavelength which is sufficiently absorbed by the oxide layer so that a discoloration of the oxide layer is produced at the irradiated areas. The problem with this method is the time and energy-consuming step of firing and cooling the workpiece.

The method of the present invention makes it possible to produce a direct and rapid marking that is indelible and which is, therefore, abrasion and scratch-proof. The markings obtained are also corrosion-proof, solvent-resistant, dimensionally stable, free from deformation, fast to light, heat, and weathering, easily legible, and have good contrast and very good edge definition. In addition, there is virtually no impairment of the mechanical, physical, and chemical properties of the marked material, e.g. mechanical strength and chemical resistance.

There has now been found a flexible method which makes it possible to mark metals, plastics, ceramic materials, glazes, glass ceramics and glasses without damaging the surface thereof and without specific requirements being

6,075,223

3

made of the substrate, which method comprises the use of a glass frit based or mixed organic materials or mixed metal oxide layer for the laser marking.

Accordingly, the present invention relates to a method of laser marking metals, plastics, ceramic materials, glazes, glass ceramics and glasses of any desired form which comprises applying to the substrate material a marking material which, depending upon its principal components, may or may not contain at least one energy absorbing enhancer then irradiating said marking material layer with a laser or diode based energy such that the radiation is directed onto said layer in accordance with the form of the marking to be applied, and using laser or diode based energy of a wavelength which is sufficiently absorbed by the marking material so that a bonding occurs on the substrate, thereby forming a marking layer atop the substrate.

SUMMARY OF THE INVENTION

The main aspect of the present invention is to provide a method to quickly, with high-resolution, high-contrast, and permanence, mark the surface of a workpiece.

Another aspect of the present invention is to provide a method to irradiate a marking material which may or may not contain at least one energy absorbing enhancer, wherein the marking material is selected from the group consisting of glass frits, glass frits with ceramic colorants, and glass frits with porcelain enamels where the workpiece is glass, ceramic, porcelain, certain metals, and certain plastics (Clear glass and glass frits do not absorb energy in the 1 micron range of te Nd:YAG or diode lasers, but do absorb energy in the 10 micron range, so these materials may not require additional energy absorbing enhancers.).

Another aspect of the present invention is to provide a method to irradiate a marking material containing mixed metal oxides where the workpiece is metal, glass, ceramic, porcelain and certain plastics.

Another aspect of the present invention is to provide a method to irradiate a marking material containing mixed organic pigments where the workpiece is plastic, glass, ceramic, porcelain and certain metals.

Other aspects of this invention will appear from the following description and appended claims, reference being made to the accompanying drawing forming a part of this specification wherein like referenced characters designate corresponding parts in the drawing.

Prior to the present invention, no quick and permanent method existed for marking certain substrate materials with enhanced contrast and/or color which would also permit the rapid change of content and/or information in the mark without structural damage to the substrate material. In theory, an optical power source, properly focused, could create the same temperatures obtained by ovens and/or kilns used in conventional "firing" processes involving marking materials. The speed of computer controls for the optical power source, the beam steering mechanism and the mark content make it possible for individual enhanced contrast and/or color marks to be bonded to the various substrate materials in extremely short time periods without structural damage in a way not attainable by any other marking or decorating process. The wide variety of marking materials make it possible to produce images with varying optical properties including, but not limited to, contrast, color, reflectance, diffraction; and varying physical properties including, but not limited to, thickness, durability, stability, structural shape and electrical conductivity.

The present inventive process of permanently marking materials will be especially useful in marking glass, ceramic,

4

porcelain, and other brittle materials whose surface structure cannot withstand the thermal shock of other commonly used high-power pulsed laser marking methods. In the present invention, the resulting image on all substrate materials has enhanced contrast and/or color which makes the mark more easily viewed and imaged by the human eye and/or machine vision equipment and is highly resistant to chemical and mechanical wear. This feature is a great advance in barcode and 2D symbology marking, whereas the prior art high-power pulsed laser-only marking systems cannot always create sufficient contrast and/or color markings.

This invention relates to the permanent bonding of enhanced contrast and/or colored materials to the surfaces of various glass, ceramic, porcelain, metal, and plastic substrates using radiant energy produced by, but not limited to, optical power sources such as lasers, laser diodes, and direct diodes. The sun's radiant energy, properly filtered and focused, could make an acceptable radiant energy source. The wavelength $(\lambda)$ and output power (watts) of the optical power source are determined by the combination of the composition of the substrate material and the natural or enhanced energy absorbing characteristics of specific marking material to be applied. The marking materials are formulated to react with various substrate materials at certain temperatures. The radiant energy source can produce the required temperatures in small localized areas within microseconds and create an environment where the desired chemical and mechanical reactions will occur. Virtually any computer-generated mark can be produced on a substrate by moving the beam emanating from the radiant energy source on the marking material on the surface of the workpiece using conventional beam steering mechanisms and/or X-Y plotter mechanisms and/or by moving the workpiece relative to a stationary beam.

The marking material is brought into contact with or physically applied to the surface of the workpiece. The beam emanating from the radiant energy source impinges upon the marking material, which absorbs the radiant energy and elevates it to the required temperature. In absorbing the radiant energy, at least a portion of the marking material is excited, i.e. has its atoms or molecules raised to an excited state. [See Webster's Encyclopedic Unabridged Dictionary of the English Language (Portland House, New York, 1989), page 497.] Typically, a temperature of 200° to 1500° F. is reached in approximately one to two microseconds. Precise temperatures are controlled by the output power of the radiant energy source and the physical position of the marking material relative to the focal plane of the radiant energy beam and the speed with which the beam is moving. Once the required temperature is achieved, the marking material and substrate will permanently bond together to form a new marking layer atop the marking material. The interaction of the radiant energy and the marking material is believed to result in an inert coating mechanically and chemically bonded to the substrate material. The marking layer is believed to form covalent bonds with the substrate material, and it is believed this chemical bond exceeds the strength of the mechanical bond. Marking materials can be formulated to absorb specific amounts of a specified wavelength of radiant energy.

$CO_2$ lasers are capable of permanently marking glass materials by thermally shocking the surface and causing fractured facets. These fractures are detrimental to the structural integrity of the glass and will continue to propagate, causing chips to fall out of the mark. Furthermore, the imaged mark has no enhanced contrast and is difficult to view or image. Certain organic materials

6,075,223

5

(wood, plastic, etc.) are easily marked using $CO_2$ lasers, but the resulting imaged mark can only have limited color and/or contrast based on the material composition and the effect of the laser energy (it will cause burning of the surface). There are a number of specially formulated plastic materials that will change color when exposed to specific laser energy and produce an enhanced contrast mark.

Nd:YAG lasers are generally capable of permanently marking a variety of metals and some organic materials. However, the same limited variation of color and contrast applies. Some steels and other hard metals can be burned with sufficient laser power to produce a dark mark against the natural surface color. However, the heat created by this method causes the area surrounding the mark to darken resulting in significantly decreased contrast. Additionally, very few color variations are possible. Most direct diodes cannot produce sufficient beam quality or power to achieve the same effects as the Nd:YAG lasers.

The principal advantages of the inventive process are:

no structural damage to the substrate material surface;

no post processing required to stabilize the finished mark;

wide variety of colors, contrasts and physical properties;

high resolution for the imaged mark;

resistant to chemical and mechanical wear;

marking speeds in seconds not minutes or hours;

image content can be changed at computer speeds; and

individual marks can be fully automated.

Features of the inventive process believed to be new are:

1) The use of laser or diode based radiation to rapidly elevate the temperature of the marking material atop the substrate to form a new marking layer atop the substrate.

2) a single laser beam pass is all that is required.

3) Selecting marking materials specially formulated to react with specific substrate materials using laser or diode based radiation as the catalyst.

4) Speed with which the mark can be produced.

5) Speed with which the content of the mark can be changed.

6) Method of delivery of marking material to the substrate surface.

7) Marks can be applied to glass and other brittle surfaces without fracturing.

8) Enhanced contrast and/or color of mark.

9) Two-, three-, or four-color images can be marked with near photo quality.

10) Elimination of any firing step of entire workpiece.

11) Ability to first ablate (if desired) and then mark selected substrates to create 3D high-contrast markings with a simple two-step process.

12) Using relatively low-cost, low-contaminating marking materials (glass frits, mixed metal oxides, or mixed organic pigments) instead of silver oxides or other high-cost highly-toxic materials.

13) Higher resolution of imaged mark (>1000 dpi).

EXAMPLES AND FIGURES

In all the below listed figures, the resulting marks were produced on commercially available Nd:YAG laser markers as manufactured, for example, by Lumonics Corporation, A B Lasers, Inc., Controlaser, Inc., and/or Rofin Sinar, Inc. with power capability and optical configurations capable of providing the referenced marker parameters. In all examples the laser marker utilized produced a spot size of 100 to 125 microns, and the surface of the workpiece was placed 2 mm to 3 mm below the focal plane of the laser beam. In FIG. 2

6

through FIG. 8 the marking material was manually applied using a soft brush with resulting thicknesses varying between 75 and 125 microns on the workpiece surface.

FIG. 1 is a photograph of a transfer label using Cerdec 24-2702 glass frit containing energy absorbing enhancers as the marking material having a thickness of approximately 250 microns and a soda-lime glass microscope slide workpiece after the inventive process. The left mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The right mark was produced using the same laser settings except that the beam speed was 300 mm/second resulting in diminished contrast.

FIG. 2 is a photograph of a stainless steel workpiece having the uppermost mark produced using Cerdec 29-1777 Amber Stain metal oxide mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process and exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second. The lower mark was produced using the same laser settings without the inventive process resulting in only an ablative laser process and a mark of varying contrast that is totally dependent upon the viewing angle.

FIG. 3 is a photograph of a polished stainless steel workpiece having the mark produced using Cerdec 29-1777 mixed metal oxide mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process and exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second.

FIG. 4 is a photograph of an aluminum workpiece having the mark produced using 10 parts Cerdec 29-1060 mixed metal oxide combined with 1 part Cerdec 29-1777 mixed metal oxide and then mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process and exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second.

FIG. 5 is a photograph of an alumina ceramic workpiece having the mark produced using Cerdec 24-2702 glass frit containing energy absorbing enhancers mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process and exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second.

FIG. 6 is a photograph of a quartz-glass light bulb having the mark produced using Cerdec 24-2702 glass frit containing energy absorbing enhancers mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process and exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second.

FIG. 7 is a photograph of a soda-lime glass microscope slide having the mark produced using Cerdec 24-2702 glass frit containing energy absorbing enhancers mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process to form a 2D symbology mark with alpha-numeric characters and exhibiting high contrast from all viewing angles with no detectable damage to the work-

6,075,223

7          8

piece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second.

FIG. 8 is a photograph of a piece of borosilicate flat panel display glass having the mark produced using Cerdec 24-2702 glass frit containing energy absorbing enhancers mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process to form a 2D symbology mark with alpha-numeric characters and exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second.

FIG. 9 is a chart showing the laser marker parameters used to produce marks on a variety of substrate materials.

FIG. 10 is a drawing of the inventive process in action.

FIG. 11 is a 2D profile of a small portion of the mark produced with the inventive process as shown in FIG. 7 with an average thickness of approximately 3 microns and a maximum thickness of approximately 14 microns. Similar results are obtained when using the inventive process on other substrate materials.

Before explaining the disclosed embodiment of the present invention in detail, it is to be understood that the invention is not limited in its application to the details of the particular arrangement shown, since the invention is capable of other embodiments. Also, the terminology used herein is for the purpose of description and not of limitation.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Below follow some basic definitions as used herein:

Ceramic and porcelain enamel: A soft melting glass similar in all cases and like other ceramic glazes, composed of fluxes and alumino-silicates. Porcelain enamels are typically used on metallic surfaces.

Glass frits: Pre-fused glass material which is produced by fritting (the rapid chilling of the molten glassy material), then ground to a powder. Frits are typically employed as a constituent in a glaze.

Mixed metal oxides: An oxide compound consisting of more than one metal oxide.

Glass frits generally are composed of alkali metal oxides, alkaline earth metal oxides, silica, boric oxide and transition metal oxides. In specific, additional information is known about the marking materials Cerdec 29-1060 Amber stain, which contains silver sulfide, copper, copper oxide, barium sulfate, iron sulfide, calcium hydroxide and crystalline silica. Also, Cerdec 29-1777 Amber stain is also known to contain silver sulfide, copper oxide, copper-iron sulfide and kaolin clay. Also, Cerdec 29-346 Amber stain is known to contain copper, copper oxide, silver sulfide, barium sulfate, iron sulfate, iron oxide, and crystalline silica. Also, Cerdec 24-2702 black stain is known to contain lead borosilicate frit, C.I. pigment black **27** (containing cobalt compounds, iron oxide chromium compound), C.I. pigment black **30** (containing nickel, manganese and chromium compounds and iron oxide) and C.I. pigment blue **72** (containing cobalt compound).

Comparable mixed metal oxide and glass frit materials can be secured through manufacturers such as Bayer Company, Cookson Matthey Zircon, Ferro Corp., Cerdec Corp., E.I. duPont de Nemours & Co., Hoechst Celanese Corp., and Dow Chemical Co.

The method of this invention is especially suitable for marking metals, plastics, glasses, and glass ceramics.

Glasses and glass ceramics are well known to the person skilled in the art and described, for example, in Ullmanns Enzyklopädie der technischen Chemie, 4th edition, Vol. 12, pp. 317–366.

By ceramic materials are meant inorganic, non-metallic, high-melting materials that are usually referred to in the literature as clay ceramics and special ceramics. Examples thereof are oxides in crystalline or glassy form, e.g. alkali metal or alkaline earth metal aluminosilicates or aluminoborates, as well as non-oxides such as carbides, nitrides, and silicides. For further examples, attention is drawn to Ullmanns Enzyklopädie der techn. Chemie, 4th Edition, Vol. 13, pp. 712–716.

Glazes are classified chemically as follows:

1. Bases, the conspicuously fluxing agents, represented by alkali metal oxides, the alkaline earth metal oxides, zinc oxide, lead oxide and many coloring oxides or chromophones.

2. Intermediates, which includes amphoteric oxides, a group from which alumina is the common example and to which ferric, chromic, manganic, and other oxides are sometimes assigned. Boric acid is sometimes considered a member of this group.

3. Acids, of which silico, phosphoric oxide, zirconia and flourine belong.

Glazes are glassy coatings applied to a ceramic material and having a composition very similar to that of glass (op. Cit., pp. 722–724). Typical examples of glazes are those consisting of quartz, clay, alkali metal oxides, alkaline earth metal oxides, and low-melting oxides (such as $Na_2O$, $K_2O$, CaO, BaO, and PbO) as fluxes.

Depending on the utility, the materials to be marked may be colorless, white, black or colored with a suitable pigment on which the resulting marking layer additionally provides contrast or which contains a pigment (e.g. metal, glass, ceramic or organic colorant).

In the practice of this invention, the laser or diode utilized must provide a relatively low energy level ranging from 1 to 20 watts at the workpiece surface to be marked. Commercially available and conventionally powered laser marking systems operating in either continuous wave or pulsed mode can be used. For example, a pulsed, Nd:YAG laser with a maximum capacity of 100 watts and pulse durations of 5 to 200 microseconds at a frequency of 20 kHz or higher could be used. However, use of this type of laser would require reducing the effect of the radiant energy using mechanical apertures and/or neutral density filters and/or polarizers and/or de-focusing the beam at the surface of the workpiece as shown in FIG. **10**.

The workpiece illustrated in FIG. 7 was created using a Lumonics Lightwriter™ lamp pumped Nd:YAG laser marker configured with a 2 mm mechanical aperture and a polarizer which produced a CW beam focused by a 100 mm by 100 mm flat field lens to a spot size of approximately 125 microns with measured power of 5 watts and which was moved by a beam steering mechanism at a speed of 200 mm/second.

Additionally, a Uniphase Stablite™ diode pumped Nd:YAG laser has been used which produced a 700 micron diameter CW beam focused using a 50 mm lens to a spot size of 90 microns with measured power of 3.1 watts and moved manually at a speed of approximately 50 mm/second.

In FIG. **10**, the conventionally powered laser beam **100**, **105** is de-focused at the surface **109** of the workpiece **106** by allowing the laser beam **100** to pass through the focal plane

6,075,223

9

102 and impinge upon the marking material 103 applied to the surface 109 of the workpiece 106. It has been shown that placing the workpiece as shown below the focal plane using the diverging radiant energy 105 is preferred over the use of the converging radiant energy 100 above the focal plane 102. The resulting spot 104 has a diameter dl in the preferred mode of 5 to 200 microns. The direction of movement 108 of the diverging laser beam 105 on the surface of the marking material 103 is shown. A beam steering mechanism 110 moves the beam. The resulting bonded layer comprising the mark 107 is shown in contrast to the remaining non-irradiated marking material 103 on the surface 109 of the workpiece 106.

In the preferred embodiment of this invention, a less expensive, less powerful air-cooled laser which consumes considerably less electric energy, such as a direct diode or diode pumped laser, is used. Optimal results are generally obtained using 5 watts of average power with a spot size of 125 microns moving at a speed of 200 mm/sec across the surface of the marking material.

Lasers whose parameters can be readily adjusted, for example, pulse content and pulse duration, permit the best possible adaptation to the requirements of the marking material 103 and the composition of workpiece 106 to be marked. In no case is a preheating of the workpiece 106 necessary. The proper radiant energy is that at which the marking material absorbs energy most efficiently. It is a major advantage of the present invention that only a single pass of the irradiating beam is required to practice the invention. In all experiments the inventive process was practiced at a room temperature of approximately 70° F. Furthermore, it is believed that both hot and cold substrate materials can be marked during their production using the inventive process.

In an alternate embodiment of the invention, the work-piece may be moved under a stationary laser beam at similar relative speeds to produce the desired mark.

Preferably, the relative speeds taught herein are executed by the use of a computer controlled workpiece movement mechanism (not shown) for example, an X-Y and/or rotary stage using stepper and/or servo motors as supplied by Newport Corporation and/or a beam steering mechanism (not shown) for example the HPM™ Scan Head using galvo-mirrors as supplied by General Scanning, Inc. Alternately, beam steering can be effected, for example, acousto-optically, holographically, or by polygon scanners.

The preferred combinations of marking materials and workpiece composition are listed below:

TABLE I

|  | Marking Materials | Substrate Materials |
|---|---|---|
| 1. | Glass frit with energy absorbing enhancers and certain colorants and/or pigments including porcelain enamels | Glass, ceramic, porcelain and certain metals including aluminum, brass, steel and stainless steel |
| 2. | Mixed metal oxides with energy absorbing enhancers and certain colorants and/or pigments | Metals including aluminum, brass, copper, nickel, tin, steel, stainless steel, and certain glasses, ceramics and plastics |
| 3. | Mixed organic pigments with energy absorbing enhancers | Plastics including ABS, PVC, Nylon ™, Delrin ™, Teflon ™ and Plexiglas ™ |

Use of and/or the combination of different compositions of marking material, second and/or subsequent applications

10

of marking material and/or the adjustment of laser parameters will result in variations in the durability, appearance, and structural form of the resulting mark. Thus, a person skilled in the art of laser marking can create a wide variety of marking characteristics to suit his requirements. All of these marking characteristics can be achieved with the use of a single low-power, low-cost air-cooled diode laser. Furthermore, an infinite variety of colors can be achieved. These features are a significant advance in the art of surface marking.

Preparation of the marking material, in liquid form, can, for example, occur through low shear mechanical mixing, high shear mechanical mixing, ultrasonic mixing and/or milling. The marking material, in liquid form, can be manually or automatically applied to the substrate surface at the desired thickness by: a) hand-painting it onto the surface; b) mechanically brushing or rolling it onto the surface; c) spraying it onto the surface; d) pad or screen printing it onto the surface; or e) flood coating the substrate surface and then scraping across the surface of the marking material on guides of desired thickness or spinning the substrate to achieve the desired thickness. Excess material not bonded to the substrate surface can be removed by conventional cleaning processes. In high-volume applications, the unused marking material can be recovered from the cleaning process and reused.

The marking material in solid form can be manually or automatically brought into contact with the substrate surface at the desired thickness by: a) pressure sensitive, slightly self-adhesive labels; or b) non-adhesive tape pressed against the substrate surface by a mechanical apparatus. The label and tape fabrication insure the proper and uniform thickness and composition of the marking material then brought into contact with the substrate surface. Additional materials used in the application of the marking material in liquid form or in the fabrication of tape and/or labels are substantially vaporized into smoke and vented away from the substrate. A laminar air flow across the surface of the workpiece is created by such venting and/or exhausting equipment insuring a consistent localized environment in which the inventive process can occur.

Transfer Marking Medium

In a particular aspect, the invention provides transfer marking media for use in the laser marking process.

These media include a carrier to which is applied, or into which is incorporated, the necessary marking material. Of particular note are pressure sensitive, slightly self-adhesive or non-adhesive tape or labels to be brought into contact with the substrate surface by a mechanical apparatus. Suitable carriers are, for example, paper and flexible plastic films such as polyester, polyethylene, and polypropylene films.

The marking materials can be formulated into a coating composition which is coated onto the carrier surface. The composition can, for example, be in the form of a pressure sensitive adhesive formulation. Alternatively, the marking material can be, for example, incorporated into the flexible polymer film of the carrier such as polyester, polyethylene, or polypropylene.

The marking material can also take the form of the so-called glass enamels. These enamels generally incorporate a lead-containing or preferably a lead-free glass frit, a colorant, and/or colored glass frit and an organic carrier.

These enamels are conventionally applied onto glass or ceramic or other non-porous substrates and fired at temperatures in the neighborhood of 600° to 900° C. to fuse the enamel to the surface of the workpiece (the substrate). In the

6,075,223

11                                                    12

present invention, the enamel can be coated in the desired thickness on the desired carrier to form the transfer marking medium.

The transfer marking medium containing the marking material either coated thereon or incorporated therein is then brought into contact with the surface of the substrate to be marked and contacted with the laser or diode based energy to effect the necessary marking. Following the application of the laser or diode based energy, the excess marking medium is removed from the substrate when the carrier is separated from the substrate surface.

The marking materials may be defined as those materials which, upon application of sufficient laser or diode based energy to produce the necessary heat, bond to glass or ceramic or other non-porous substrate to provide an enhanced contrast and/or color marking on the substrate. Low temperature glass frits can be used alone or in combination with other materials.

Examples of suitable inorganic pigments which might be used are described in Ullmanns Enzyklopädoe der techn. Chemie, 4th Edition, Vol. 14, pp. 1–12, and in the publication of the Dry Color Manufacturers' Association (DCMA) "Classification and Description of the Mixed Metal Oxide Inorganic Colored Pigments", Second Edition, January, 1982. These pigments are "ceramic colorants:", for example, compounds of oxides of different transition elements or compounds of oxides of transition elements and of metal oxides of elements of the main groups of the Periodic System, e.g., having the spinel-type structure, and also compounds such as zirconium silicate, zirconium oxide or tin oxide, the crystal lattice of which contains ions of transition metals or rare earth metals, as e.g., in zirconium vanadium blue, in zirconium preseodyme yellow and in zirconium iron pink, or the cadmium sulfides and cadmium sulfoselenides as well as inclusion pigments containing such compounds, e.g., based on zirconium silicate, tin oxide, zirconium oxide or quartz.

Examples of typical ceramic colorants are cobalt aluminates, chrome tin pink sphere, chrome tin orchid cassitorite, tin vanadium yellow, zirconium preseodyme yellow, zirconium iron pink, the cadmium sulfoselenides and cadmium sulfides and the inclusion compounds containing them, e.g., zirconium silicate, tin oxide, zirconium oxide or quartz; copper-red, manganese pink, colcothar, the iron oxide brown pigments such as iron oxides, iron-chrome-alumina spinels, manganese-alumina spinels, wine-chrome spinels, iron-alumina spinels, zinc-iron spinels, nickel-iron spinels, manganese-chrome spinels, zinc-iron-chrome spinels, tin oxide, titanium dioxide and titanates, e.g., nickel-antimony titanate, chrome-antimony titanate or manganese-antimony titanate.

Preferred pigments are zirconium vanadium yellow, preseodyme yellow, the iron oxide brown pigments such as zinc-iron-chrome spinels and zirconium iron pink, titanium dioxide, titanates, cadmium sulfides and cadmium sulfoselenides as well as inclusion pigments containing such compounds.

Examples of laser or diode based energy sources to be used are solid state pulsed and/or CW lasers such as ruby lasers or frequency multiplied Nd:YAG lasers, pulsed lasers with booster such as pulsed dye lasers or Raman shifter, and also continuous-wave lasers with pulse modifications (Q-switch, mode locker), for example, on the basis of CW Nd:YAG lasers with or without frequency multiplier or CW ion lasers (Ar, KR), as well as pulsed metal vapor lasers; for example, copper vapor lasers or gold vapor lasers, or high-capacity pulsed or continuous wave semi-conductor diode lasers, and also pulsed gas lasers such as CO2 and excimer.

What is preferred is a low-power (six watts), low-cost continuous-wave diode laser. Any of the other higher power lasers need to have the power partially attenuated by known means including mechanical apertures and/or neutral-density filters and/or polarizers and/or low-efficiency mirrors.

The wavelength to be selected for the laser or diode based energy source is that at which the marking material, with or without the energy absorbing enhancer absorbs the radiation most efficiently.

Several different methods are suitable for laser marking, for example: a) the mask method whereby the area to be marked is uniformly coated with the marking material and the radiant energy passes through a fixed, data specific mask and impinges onto the marking material to produce the desired mark; and b) the dot-matrix method whereby the area to be marked is uniformly coated with the marking material and the radiant energy passes through a computer controlled, changeable data, dot-matrix mask and impinges onto the marking material to produce the desired mark; and c) the beam deflection method whereby the area to be marked is uniformly coated with the marking material and the radiant energy passes through a beam steering head and impinges onto the marking material to produce the desired mark; and d) the X-Y plotter method whereby the area to be marked is uniformly coated with the marking material and the radiant energy moves on a gantry type X-Y mechanism utilizing mirrors and/or fiber-optics and impinges onto the marking material to produce the desired mark; and e) the part moving method whereby the area to be marked is uniformly coated with the marking material and the work-piece to be marked is moved using an X-Y motor driven stage under a stationary beam which impinges onto the marking material to produce the desired mark; and f) the area irradiation method whereby data specific marking material is uniformly applied to the surface of the workpiece and the data specific marking area is irradiated by means of a beam steering mechanism or by means of moving the workpiece under a stationary beam. In methods b), c), d), e) and f) the laser is preferably combined with a laser marking system so that the marking material can be irradiated with any, e.g., computer programmed, digits, letters and special symbols where the laser beam strikes the marking material in the most efficent manner possible.

In one particularly important aspect of the invention, the marking materials can be formulated to absorb a narrow band of wavelengths, e.g., approximately 1 micron, and will react with the substrate material when the proper temperature is achieved. In this way, a single optimal power source (laser or diode) can be employed to mark all materials.

Although the present invention has been described with reference to preferred embodiments, numerous modifications and variations can be made and still the result will come within the scope of the invention. No limitation with respect to the specific embodiments disclosed herein is intended or should be inferred.

I claim:

1. A thermally activated, chemically based marking method comprising the steps of:
   applying a layer of glass frit material containing an energy absorbing enhancer to a glass substrate;
   irradiating said layer with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancer in accordance with the form of a marking to be applied, thereby forming a bonded and permanent marking layer atop the substrate which is visible in contrast with the substrate; and

6,075,223

**13**

wherein the layer of glass frit material further comprises a thickness ranging between 5 and 500 microns.

2. The method of claim 1 further comprising the step of providing a laminar air flow across the substrate during the irradiating step.

3. The method of claim 1, wherein the glass frit material further comprises borosilicate glass and the energy absorbing enhancer further comprises a colorant.

4. The method of claim 1, wherein the radiant energy beam further comprises a laser beam having an energy level ranging between 1 and 30 watts a spot size ranging between 5 and 200 microns, and a marking speed along the substrate ranging between 25 and 1000 mm/sec.

5. The method of claim 4, wherein the energy level ranges from 1–12 watts cw.

6. The method of claim 1 further comprising the step of starting at a room temperature of about 70° F.

7. The method of claim 1, wherein the glass frit material further comprises a colorant.

8. A glass material as laser marked by the process according to claim 1.

9. A thermally activated chemically based marking method comprising the steps of:

applying a layer of glass frit material containing an energy absorbing enhancer to a metal substrate;

irradiating said layer with a radiant energy beam having a wavelength selected to excite the energy absorbing layer in accordance with the form of a marking to be applied, thereby forming a bonded and permanent marking layer atop the substrate which is visible in contrast with the substrate; and

wherein the layer of glass frit material further comprises a thickness ranging between 5 and 500 microns.

10. The method of claim 9 further comprising the step of providing a laminar air flow across the substrate during the irradiating step.

11. The method of claim 9, wherein the glass frit material further comprises borosilicate glass, and the energy absorbing enhancer further comprises a colorant.

12. The method of claim 9, wherein the radiant energy beam further comprises a laser beam having an energy level ranging between 1 and 30 watts, a spot size ranging between 5 and 200 microns, and a marking speed along the substrate ranging between 25 and 1000 mm/sec.

13. A metal material as laser marked by the process according to claim 9.

14. The method of claim 9 further comprising the step of starting at a room temperature of about 70° F.

15. The method of claim 9, wherein the glass frit material further comprises a colorant.

16. A thermally activated chemically based marking method comprising the steps of:

applying a glass frit material containing an energy absorbing enhancer to a carrier;

placing the carrier in contact with the substrate to be marked; and

irradiating the carrier with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancer in accordance with the form of a marking to be applied, thereby forming a bonded and permanent marking layer atop the substrate which is visible in contrast with the substrate.

17. A thermally activated chemically based marking method comprising the steps of:

applying a layer of glass frit material containing an energy absorbing enhancer to a substrate to be marked in the form of a marking to be applied;

**14**

irradiating said layer with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancer, thereby forming a bonded and permanent marking layer atop the substrate which is visible in contrast with the substrate; and

wherein the layer of glass frit material has a thickness ranging between 5 and 500 microns.

18. The method of claim 17 further comprising the step of providing a laminar air flow across the substrate during the irradiating step.

19. The method of claim 17, wherein the glass frit material further comprises borosilicate glass and the energy absorbing enhancer further comprises a colorant.

20. The method of claim 17, wherein the radiant energy beam further comprises a laser beam having an energy level ranging between 1 and 30 watts and a marking speed along the substrate ranging between 25 and 1000 mm/sec.

21. The method of claim 17 further comprising the step of starting at a room temperature of about 70° F.

22. The method of claim 17, wherein the glass frit material further comprises a colorant.

23. A glass material as laser marked by the process according to claim 17.

24. A thermally activated chemically based marking method comprising steps of:

applying a layer of glass frit material comprising an energy absorbing enhancing component to a metal substrate; and

irradiating said layer with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancing component, thereby forming an adhered layer atop the substrate which is visible in contrast with the substrate.

25. The method of claim 24, wherein the energy level ranges from 1–12 watts cw.

26. A thermally activated chemically based marking method comprising steps of:

applying a glass frit material comprising an energy absorbing enhancing component to a carrier;

placing the carrier in contact with the substrate to be marked; and

irradiating the carrier with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancing component in accordance with the form of a marking to be applied, thereby forming a bonded and permanent marking layer atop the substrate which is visible in contrast with the substrate.

27. The method of claim 26, wherein the energy level ranges from 1–12 watts cw.

28. A thermally-activated chemically-based marking method comprising the steps of:

applying a layer of glass frit material comprising an energy-absorbing enhancing component to a substrate selected form the group consisting of glass, ceramic, porcelain, and metal;

irradiating said layer with a radiant energy beam watts and having a wavelength selected to excite the energy absorbing enhancing component in accordance with the form of a marking to be applied, thereby a marking layer bonded to a substrate surface and contrasting with said substrate surface and not damaging said substrate surface; and

wherein the radiant energy source is a continuous-wave diode laser having an energy level of about six watts.

29. The method of claim 28, wherein said glass frit material is in liquid form.

6,075,223

15

30. The method of claim 28, wherein said radiant energy beam is a laser beam having a spot size ranging between 5 and 200 microns and a marking speed along the substrate ranging between 25 and 1000 mm/sec.

31. A thermally-activated chemically-based marking method comprising the steps of:

applying a layer of glass frit material containing an energy absorbing enhancer to a glass substrate;

irradiating said layer with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancer in accordance with the form of a marking to be applied, thereby forming a bonded and permanent marking layer atop the substrate which is visible in contrast with the substrate;

wherein the radiant energy beam further comprises a laser beam having a spot size ranging between 5 and 200 microns, and a marking speed along the substrate ranging between 25 and 1000 mm/sec, and

an energy level that is about 5 watts Q switched at about 20,000 Hz.

32. A thermally-activated chemically-based marking method comprising the steps of:

16

applying a layer of glass frit material comprising an energy-absorbing enhancing component to a substrate selected form the group consisting of glass, ceramic, porcelain, and metal;

irradiating said layer with a radiant energy beam having an energy level equal to or less than six watts and having a wavelength selected to excite the energy absorbing enhancing component in accordance with the form of a marking to be applied, thereby forming a marking layer bonded to a substrate surface and contrasting with said substrate surface and not damaging said substrate surface; and

wherein the radiant energy source is a continuous-wave diode laser.

33. The method of claim 32, wherein said glass frit material is in liquid form.

34. The method of claim 32, wherein said radiant energy beam is a laser beam having a spot size ranging between 5 and 200 microns and a marking speed along the substrate ranging between 25 and 1000 mm/sec.

*    *    *    *    *

# EXHIBIT B



US006313436B1

(12) **United States Patent**
Harrison

(10) **Patent No.: US 6,313,436 B1**
(45) **Date of Patent: Nov. 6, 2001**

(54) **HIGH CONTRAST SURFACE MARKING USING METAL OXIDES**

(75) Inventor: **Paul Wollcott Harrison**, Los Angeles, CA (US)

(73) Assignee: **Thermark, LLC**, Los Angeles, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/477,921**

(22) Filed: **Jan. 5, 2000**

**Related U.S. Application Data**

(62) Division of application No. 08/925,031, filed on Sep. 8, 1997, now Pat. No. 6,075,223.

(51) Int. Cl.[7] ..................................................... **B23K 26/00**

(52) U.S. Cl. .................. **219/121.85**; 347/224; 427/555; 427/556

(58) Field of Search .................................... 427/554, 555, 427/556; 219/121.61, 121.69, 121.67, 121.85; 347/224, 227; 65/30.11

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,945,318 | * | 3/1976 | Landsman ............................. 430/200 |
| 3,962,513 | * | 6/1976 | Eames .................................. 430/200 |
| 4,306,012 | * | 12/1981 | Scheve . |
| 4,327,283 | * | 4/1982 | Heyman et al. ..................... 235/487 |
| 4,515,867 | * | 5/1985 | Bleacher et al. ................... 428/204 |
| 4,541,340 | * | 9/1985 | Peart et al. ......................... 101/470 |
| 4,651,313 | * | 3/1987 | Guez ...................................... 369/14 |
| 4,769,310 | * | 9/1988 | Gugger et al. ...................... 430/346 |
| 4,847,181 | * | 7/1989 | Shimokawa ........................... 430/297 |
| 4,854,957 | * | 8/1989 | Borrelli et al. ...................... 65/30.11 |
| 4,856,670 | * | 8/1989 | Hang . |
| 4,861,620 | * | 8/1989 | Azuma et al. . |
| 4,912,298 | * | 3/1990 | Daniels et al. ................. 219/121.69 |
| 5,030,551 | * | 7/1991 | Herran et al. . |
| 5,035,983 | * | 7/1991 | Kiyonari et al. .................. 346/135.1 |

| | | | |
|---|---|---|---|
| 5,061,341 | * | 10/1991 | Kildal et al. ......................... 156/632 |
| 5,075,195 | * | 12/1991 | Babler et al. ....................... 430/200 |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 201136 | * | 9/1981 | (DE) . |
| 215776 | * | 11/1984 | (DE) . |
| 3539047 | * | 10/1986 | (DE) . |
| 419377 | * | 9/1990 | (EP) . |
| 531584 | * | 3/1991 | (EP) . |
| 716135 | * | 6/1996 | (EP) . |
| 761377 | * | 8/1996 | (EP) . |
| 782933 | * | 12/1996 | (EP) . |
| 2 772 021 | | 8/1997 | (FR) . |
| 2 774 931 | | 2/1998 | (FR) . |
| 2227570 | * | 1/1990 | (GB) . |

(List continued on next page.)

OTHER PUBLICATIONS

Karheinz Hahn, Claudia Buerhop, and Rudolf Weibmann, "Firing PbO–Free Glass Enamels Using the CW–CO2 Laser", No Publication Date.*
International Searching Authority, International Search Report, 9 Pages Total Aug. 9, 1989.*

*Primary Examiner*—Geoffrey S. Evans
(74) *Attorney, Agent, or Firm*—Rick Martin; Patent Law Offices of Rick Martin, P.C.

(57) **ABSTRACT**

A method of laser marking metals, plastics, ceramic materials, glazes, glass ceramics, and glasses of any desired form, which comprises applying to the material to be marked a variable thickness layer of marking material containing energy absorbing enhancers then irradiating said layer with a laser or diode based energy source such that the radiation is directed onto said layer in accordance with the form of the marking to be applied, and using a laser or diode based energy source of a wavelength which is sufficiently absorbed by the marking material so as to create a bonding of the marking material to the surface of the workpiece at the irradiated areas.

**38 Claims, 10 Drawing Sheets**



US 6,313,436 B1

Page 2

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,116,674 | * | 5/1992 | Schmidhalter et al. . | |
| 5,175,425 | * | 12/1992 | Spratte et al. | 347/224 |
| 5,359,176 | * | 10/1994 | Balliet, Jr. et al. | 219/121.67 |
| 5,397,686 | * | 3/1995 | Dominick et al. | 430/346 |
| 5,409,742 | * | 4/1995 | Artsten et al. | 427/555 |
| 5,422,146 | | 6/1995 | Adams . | |
| 5,427,825 | * | 6/1995 | Murnick | 427/555 |
| 5,523,125 | * | 6/1996 | Kennedy et al. | 427/555 |
| 5,543,269 | * | 8/1996 | Chatterjee et al. | 430/346 |
| 5,554,335 | * | 9/1996 | Fields et al. | 264/400 |
| 5,609,778 | * | 3/1997 | Pulaski et al. | 219/121.69 |
| 5,637,244 | * | 6/1997 | Evokhin | 219/121.69 |
| 5,719,372 | * | 2/1998 | Togari et al. | 219/121.61 |
| 5,734,412 | * | 3/1998 | Hasebe et al. | 347/247 |
| 5,740,941 | * | 4/1998 | Lemelson | 220/454 |
| 5,760,367 | * | 6/1998 | Rosenwasser et al. | 219/121.69 |
| 5,761,111 | * | 6/1998 | Glezer | 365/106 |
| 5,767,483 | * | 6/1998 | Cameron et al. | 219/121.85 |
| 5,783,507 | * | 7/1998 | Sakoske | 501/17 |
| 5,801,356 | * | 9/1998 | Richman | 219/121.69 |
| 5,804,342 | * | 9/1998 | Paz-Puglat et al. | 430/19 |
| 5,985,078 | * | 11/1999 | Suess et al. . | |

## FOREIGN PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 62-223940 | * | 10/1987 | (JP) . | |
| 63-216790 | * | 9/1988 | (JP) . | |
| 1-194235 | * | 8/1989 | (JP) | 427/554 |
| 5-138114 | * | 6/1993 | (JP) | 427/554 |
| 6-106378 | * | 4/1994 | (JP) . | |
| 95/13195 | * | 5/1995 | (WO) . | |
| 96/3221 | * | 10/1996 | (WO) . | |
| WO 99/29519 | | 6/1999 | (WO) . | |
| WO 99/42421 | | 8/1999 | (WO) . | |

* cited by examiner



*FIG.1*



*FIG.2*



*FIG.3*



*FIG.4*



*FIG.5*



FIG.6



*FIG.7*



*FIG.8*

**U.S. Patent**          Nov. 6, 2001          Sheet 6 of 10          US 6,313,436 B1

| Substrate Materials | Marking Materials | Beam Speed | Power (watts) | Freq (Khz/Cw) |
|---|---|---|---|---|
| Aluminum | Mixed Metal Oxide | 200mm/sec | 5 watts | CW |
| Aluminum | Glass Frit | 250mm/sec | 5 watts | CW |
| Brass | Mixed Metal Oxide | 200mm/sec | 5 watts | CW |
| Ceramic | Glass Frit | 200mm/sec | 5 watts | CW |
| China | Glass Frit | 200mm/sec | 5 watts | CW |
| Copper | Mixed Metal Oxide | 100mm/sec | 5 watts | 20 KHz |
| Auto Safety Glass | Glass Frit | 200mm/sec | 5 watts | CW |
| CRT Display Glass | Glass Frit | 200mm/sec | 5 watts | CW |
| Flat Panel Display Glass | Glass Frit | 200mm/sec | 5 watts | CW |
| Microscope Slide Glass | Glass Frit | 200mm/sec | 5 watts | CW |
| Nickel | Mixed Metal Oxide | 200mm/sec | 5 watts | CW |
| Nylon™ | Mixed Metal Oxides | 250mm/sec | 5 watts | CW |
| Porcelain | Glass Frit | 200mm/sec | 5 watts | CW |
| PVC | Mixed Organic Pigments | 200mm/sec | 5 watts | CW |
| Stainless Steel | Mixed Metal Oxide | 200mm/sec | 5 watts | CW |
| Stainless Steel | Glass Frit | 300mm/sec | 5 watts | CW |
| Teflon™ | Mixed Metal Oxides | 200mm/sec | 5 watts | CW |
| Tin | Mixed Metal Oxide | 200mm/sec | 5 watts | CW |
| Titanium | Mixed Metal Oxide | 200mm/sec | 5 watts | CW |

**FIG. 9**



FIG.10



*FIG.11a*



*FIG.11b*



*FIG.11c*



Y–PROFILE/CIRCULAR

Rq: 2.85 um
Ra: 2.44 um
Rt: 9.96 um
Rp: 7.79 um
Rv: −2.16 um

L: 13.93 um −2.15 um
R: 170.62 um 0.54 um
D: 156.69 um 2.69 um

Angle: 0.98°
Curve: −492.76 um
Terms: None
AvgHt: 1.20 um
Area: 187.84 um2

FIG.11d

US 6,313,436 B1

1

# HIGH CONTRAST SURFACE MARKING USING METAL OXIDES

## CROSS RELATED PATENTS

This application is a divisional application from the parent U.S. Application Ser. No. 08/925,031 filed Sep. 8, 1997 and issued as U.S. Pat. No. 6,075,223 on Jun. 13, 2000.

## FIELD OF INVENTION

The present invention relates to a method of producing permanent, enhanced contrast and/or color markings formed as a new marking layer on top of substrates including glass, ceramic, porcelain, metal, and plastic. A laser beam irradiates a marking medium having a glass frit containing an energy absorbing enhancer, or alternatively the marking medium can be a mixed metal oxide or a mixed organic pigment.

## BACKGROUND OF THE INVENTION

The marking of ceramic materials, glazes and glasses can be effected by conventional marking and decoration methods such as etching, cutting, engraving, grinding or by applying a glass or glaze colorant. In these methods, the surface of the marked material is altered with the consequence that the material may suffer damage, especially if marking is effected by etching, engraving, or cutting. The application of a glass or glaze colorant necessitates, in addition, a second firing step. The markings so produced are not always satisfactory in all respects.

It is also known to mark glass by means of a laser beam, whereas the known methods are based on melting or removing substrate material such that the surface of the marked material is also altered.

German offenlegungsschrift 3 539 047 postulates a method of decorating, marking, and engraving enameled objects using laser beams by incorporating into the enamel coating opacifying agents which the laser beam causes to decompose optically and locally; for example, oxides of titanium, tin, cerium, and antimony. A drawback of this method is that, for example, transparent enameled objects cannot be marked because the opacifying agent incorporated in the enamel coating does not change optically at the non-irradiated areas and, therefore, strongly influences the overall appearance of the object. Furthermore, the opacifying agent employed may adversely affect the mechanical properties of the enamel.

Industry has sought to surface mark glass, ceramic, porcelain, metal, plastics, and the like with four physical attributes. These four attributes are high-resolution, high-contrast, permanence, and speed.

Well known efforts to date have only produced two or three of these attributes. For example, kiln marking ceramics using glass frit material at kiln temperatures ranging from 100° to 10000° C. results in high-resolution, high-contrast, permanent indicia on ceramics, glass, and metals. These known processes require heating the entire substrate along with the glass frit or metal oxide marking material in a kiln. The problem with these processes is the time factor and energy consumption are not commercially efficient to create the indicia. Time factors ranging from minutes to hours are common. Energy consumption of a kiln is generally measured in kilowatts per ton and/or BTUs per pound. Furthermore, these processes do not lend themselves to portability.

Another known marking method is peening on metal. This method cannot be used on glass, ceramic, or other brittle

2

materials because of surface damage and/or breakage. Where used, this method produces a high-resolution, permanent, fast surface indicia. However, high contrast marks are not produced.

Other known marking methods are ink printing methods. One state of the art transfer printing method is taught by WO 95/13195 (May 1995) to Meneghine et al., assigned to Markem Corporation. These methods use a laser-transferable ink on a plastic carrier. The ink is mixed in a transfer medium solution in order to enhance the conversion of laser (IR) energy to heat. These methods produce a high-resolution, high-contrast, and relatively fast method. There is a UV cure step which is time consuming. The problem with this and all ink methods is a lack of permanence. Acids and other solvents remove ink from a hard surface. This method teaches curing the ink onto the substrate surface. The present invention teaches bonding a marking medium to form a new marking layer atop the substrate surface rather than transferring an ink to the substrate and then curing the ink.

Another well known marking method teaches the use of ink jet printers. In order to improve application performance, appearance and permanence, environmentally hazardous solvents are mixed with the ink. Even with these hazardous solvents however, significant improvement has not been achieved.

U.S. Pat. No. 4,541,340 (1985) to Peart et al. discloses a printing process for marking fabrics or plastics in a permanent image. Sublimable dyes are used such as nitroso dyes. A diffusion of the dyestuff into the substrate is caused by a pressurized air step on a transfer label. Only application to fabrics and plastics is taught. The chemistry is different from the present invention.

However, the result of a permanent high contrast mark is claimed:

Another related group of marking methods is laser combined with glass frit or metal oxide marking mediums. U.S. Pat. No. 4,769,310 (1988) to Gugger et al. teaches first creating a glaze in a kiln process. The glaze has a radiation sensitive additive in amounts ranging from 0.01 to 30% by weight. This glaze is then irradiated by a beam of Nd:YAG pulsed laser having light pulses of six to eight nanoseconds at a wavelength of .532 $\mu m$ and a pulse content of 250 milli-joules. The problem with this method is the burden of creating a time consuming glaze surface before applying the high-speed laser beam.

U.S. Pat. No. 5,030,551 (1991) to Herren et al. teaches a laser-based method to mark ceramic materials, glazes, glass ceramics, and glasses by first applying to a workpiece a 100 to 10,000 Angstrom thick transparent layer of titanium dioxide. Second, the workpiece is fired in an oven at 620° C. for one minute and then slowly cooled in the closed oven. Third, the layer is irradiated with a pulsed laser in accordance with the form of the marking to be applied. The laser light must have a wavelength which is sufficiently absorbed by the oxide layer so that a discoloration of the oxide layer is produced at the irradiated areas. The problem with this method is the time and energy-consuming step of firing and cooling the workpiece.

The method of the present invention makes it possible to produce a direct and rapid marking that is indelible and which is, therefore, abrasion and scratch-proof. The markings obtained are also corrosion-proof, solvent-resistant, dimensionally stable, free from deformation, fast to light, heat, and weathering, easily legible, and

US 6,313,436 B1

3

have good contrast and very good edge definition. In addition, there is virtually no impairment of the mechanical, physical, and chemical properties of the marked material, e.g. mechanical strength and chemical resistance.

There has now been found a flexible method which makes it possible to mark metals, plastics, ceramic materials, glazes, glass ceramics and glasses without damaging the surface thereof and without specific requirements being made of the substrate, which method comprises the use of a glass frit based or mixed organic materials or mixed metal oxide layer for the laser marking.

Accordingly, the present invention relates to a method of laser marking metals, plastics, ceramic materials, glazes, glass ceramics and glasses of any desired form which comprises applying to the substrate material a marking material which, depending upon its principal components, may or may not contain at least one energy absorbing enhancer then irradiating said marking material layer with a laser or diode based energy such that the radiation is directed onto said layer in accordance with the form of the marking to be applied, and using laser or diode based energy of a wavelength which is sufficiently absorbed by the marking material so that a bonding occurs on the substrate , thereby forming a marking layer atop the substrate.

SUMMARY OF THE INVENTION

The main aspect of the present invention is to provide a method to quickly, with high-resolution, high-contrast, and permanence, mark the surface of a workpiece.

Another aspect of the present invention is to provide a method to irradiate a marking material which may or may not contain at least one energy absorbing enhancer, wherein the marking material is selected from the group consisting of glass frits, glass frits with ceramic colorants, and glass frits with porcelain enamels where the workpiece is glass, ceramic, porcelain, certain metals, and certain plastics. (Clear glass and glass frits do not absorb energy in the 1 micron range of the Nd:YAG or diode lasers, but do absorb energy in the 10 micron range, so these materials may not require additional energy absorbing enhancers.) Another aspect of the present invention is to provide a method to irradiate a marking material containing mixed metal oxides where the workpiece is metal, glass, ceramic, porcelain and certain plastics.

Another aspect of the present invention is to provide a method to irradiate a marking material containing mixed organic pigments where the workpiece is plastic, glass, ceramic, porcelain and certain metals.

Other aspects of this invention will appear from the following description and appended claims, reference being made to the accompanying drawing forming a part of this specification wherein like referenced characters designate corresponding parts in the drawing.

Prior to the present invention, no quick and permanent method existed for marking certain substrate materials with enhanced contrast and/or color which would also permit the rapid change of content and/or information in the mark without structural damage to the substrate material. In theory, an optical power source, properly focused, could create the same temperatures obtained by ovens and/or kilns used in conventional "firing" processes involving marking materials. The speed of computer controls for the optical power source, the beam steering mechanism and the mark content make it possible for individual enhanced contrast and/or color marks to be bonded to the various substrate

4

materials in extremely short time periods without structural damage in a way not attainable by any other marking or decorating process. The wide variety of marking materials make it possible to produce images with varying optical properties including, but not limited to, contrast, color, reflectance, diffraction; and varying physical properties including, but not limited to, thickness, durability, stability, structural shape and electrical conductivity.

The present inventive process of permanently marking materials will be especially useful in marking glass, ceramic, porcelain, and other brittle materials whose surface structure cannot withstand the thermal shock of other commonly used high-power pulsed laser marking methods. In the present invention, the resulting image on all substrate materials has enhanced contrast and/or color which makes the mark more easily viewed and imaged by the human eye and/or machine vision equipment and is highly resistant to chemical and mechanical wear. This feature is a great advance in barcode and 2D symbology marking, whereas the prior art high-power pulsed laser-only marking systems cannot always create sufficient contrast and/or color markings.

This invention relates to the permanent bonding of enhanced contrast and/or colored materials to the surfaces of various glass, ceramic, porcelain, metal, and plastic substrates using radiant energy produced by, but not limited to, optical power sources such as lasers, laser diodes, and direct diodes. The sun's radiant energy, properly filtered and focused, could make an acceptable radiant energy source. The wavelength ($\lambda$) and output power (watts) of the optical power source are determined by the combination of the composition of the substrate material and the natural or enhanced energy absorbing characteristics of specific marking material to be applied. The marking materials are formulated to react with various substrate materials at certain temperatures. The radiant energy source can produce the required temperatures in small localized areas within microseconds and create an environment where the desired chemical and mechanical reactions will occur. Virtually any computer-generated mark can be produced on a substrate by moving the beam emanating from the radiant energy source on the marking material on the surface of the workpiece using conventional beam steering mechanisms and/or X–Y plotter mechanisms and/or by moving the workpiece relative to a stationary beam.

The marking material is brought into contact with or physically applied to the surface of the workpiece. The beam emanating from the radiant energy source impinges upon the marking material, which absorbs the radiant energy and elevates it to the required temperature. In absorbing the radiant energy, at least a portion of the marking material is excited, i.e. has it atoms or molecules raised to an excited state. [See *Webster's Encyclopedic Unabridged Dictionary of the English Language* (Portland House, New York, 1989), page 497.] Typically , a temperature of 2000 to 15000° F. is reached in approximately one to two microseconds. Precise temperatures are controlled by the output power of the radiant energy source and the physical position of the marking material relative to the focal plane of the radiant energy beam and the speed with which the beam is moving. Once the required temperature is achieved, the marking material and substrate will permanently bond together to form a new marking layer atop the substrate. The interaction of the radiant energy and the marking material is believed to result in an inert coating mechanically and chemically bonded to the substrate material. The marking layer is believed to form covalent bonds with the substrate material, and it is believed this chemical bond exceeds the strength of

US 6,313,436 B1

5

the mechanical bond. Marking materials can be formulated to absorb specific amounts of a specified wavelength of the radiant energy.

$CO_2$ lasers are capable of permanently marking glass materials by thermally shocking the surface and causing fractured facets. These fractures are detrimental to the structural integrity of the glass and will continue to propagate, causing chips to fall out of the mark. Furthermore, the imaged mark has no enhanced contrast and is difficult to view or image. Certain organic materials (wood, plastic, etc.) are easily marked using $CO_2$ lasers, but the resulting imaged mark can only have limited color and/or contrast based on the material composition and the effect of the laser energy (it will cause burning of the surface). There are a number of specially formulated plastic materials that will change color when exposed to specific laser energy and produce an enhanced contrast mark.

Nd:YAG lasers are generally capable of permanently marking a variety of metals and some organic materials. However, the same limited variation of color and contrast applies. Some steels and other hard metals can be burned with sufficient laser power to produce a dark mark against the natural surface color. However, the heat created by this method causes the area surrounding the mark to darken resulting in significantly decreased contrast. Additionally, very few color variations are possible. Most direct diodes cannot produce sufficient beam quality or power to achieve the same effects as the Nd:YAG lasers.

The principal advantages of the inventive process are:

no structural damage to the substrate material surface;

no post processing required to stabilize the finished mark;

wide variety of colors, contrasts and physical properties;

high resolution for the imaged mark;

resistant to chemical and mechanical wear;

marking speeds in seconds not minutes or hours;

image content can be changed at computer speeds; and

individual marks can be fully automated. Features of the inventive process believed to be new are:

1) The use of laser or diode based radiation to rapidly elevate the temperature of the marking material atop the substrate to form a new marking layer atop the substrate.

2) a single laser beam pass is all that is required.

3) Selecting marking materials specially formulated to react with specific substrate materials using laser or diode based radiation as the catalyst.

4) Speed with which the mark can be produced.

5) Speed with which the content of the mark can be changed.

6) Method of delivery of marking material to the substrate surface.

7) Marks can be applied to glass and other brittle surfaces without fracturing.

8) Enhanced contrast and/or color of mark.

9) Two-, three-, or four-color images can be marked with near photo quality.

10) Elimination of any firing step of entire workpiece.

11) Ability to first ablate (if desired) and then mark selected substrates to create 3D high-contrast markings with a simple two-step process.

12) Using relatively low-cost, low-contaminating marking materials (glass frits, mixed metal oxides, or mixed

6

organic pigments) instead of silver oxides or other high-cost highly-toxic materials.

13) Higher resolution of imaged mark (>1000 dpi).

EXAMPLES AND FIGURES

In all the below listed figures, the resulting marks were produced on commercially available Nd:YAG laser markers as manufactured, for example, by Lumonics Corporation, A B Lasers, Inc., Controlaser, Inc., and/or Rofin Sinar, Inc. with power capability and optical configurations capable of providing the referenced marker parameters. In all examples the laser marker utilized produced a spot size of 100 to 125 microns, and the surface of the workpiece was placed 2 mm to 3 mm below the focal plane of the laser beam. In FIG. 2 through FIG. 8 the marking material was manually applied using a soft brush with resulting thicknesses varying between 75 and 125 microns on the workpiece surface.

FIG. 1 is a photograph of a transfer label using Cerdec 24-2702 glass frit containing energy absorbing enhancers as the marking material having a thickness of approximately 250 microns and a soda-lime glass microscope slide workpiece after the inventive process. The left mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The right mark was produced using the same laser settings except that the beam speed was 300 mm/second resulting in diminished contrast.

FIG. 2 is a photograph of a stainless steel workpiece having the uppermost mark produced using Cerdec 29-1777 Amber Stain mixed metal oxide mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process and exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second. The lower mark was produced using the same laser settings without the inventive process resulting in only an ablative laser process and a mark of varying contrast that is totally dependent upon the viewing angle.

FIG. 3 is a photograph of a polished stainless steel workpiece having the mark produced using Cerdec 29-1777 mixed metal oxide mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process and exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second.

FIG. 4 is a photograph of an aluminum workpiece having the mark produced using 10 parts Cerdec 29-1060 mixed metal oxide combined with 1 part Cerdec 29-1777 mixed metal oxide and then mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process and exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The mark was produced using 5 watts of CW energy at a beam speed of 20 mm/second.

FIG. 5 is a photograph of an alumina ceramic workpiece having the mark produced using Cerdec 24-2702 glass frit containing energy absorbing enhancers mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process and exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second.

FIG. 6 is a photograph of a quartz-glass light bulb having the mark produced using Cerdec 24-2702 glass frit contain-

US 6,313,436 B1

7

ing energy absorbing enhancers mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process and exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second.

FIG. 7 is a photograph of a soda-lime glass microscope slide having the mark produced using Cerdec 24-2702 glass frit containing energy absorbing enhancers mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process and exhibiting high contrast from all viewing angles with no detectable damage to the work-piece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second.

FIG. 8 is a photograph of a piece of borosilicate flat panel display glass having the mark produced using Cerdec 24-2702 glass frit containing energy absorbing enhancers mixed at a 1/1 ratio by weight with mineral oil as the marking material with the inventive process to form a 2D symbology mark with alpha-numeric characters and exhibiting high contrast from all viewing angles with no detectable damage to the workpiece surface. The mark was produced using 5 watts of CW energy at a beam speed of 200 mm/second.

FIG. 9 is a chart showing the laser marker parameters used to produce marks on a variety of substrate materials.

FIG. 10 is a drawing of the inventive process in action.

FIG. 11 is a 2D profile of a small portion of the mark produced with the inventive process as shown in FIG. 7 with an average thickness of approximately 3 microns and a maximum thickness of approximately 14 microns. Similar results are obtained when using the inventive process on other substrate materials.

Before explaining the disclosed embodiment of the present invention in detail, it is to be understood that the invention is not limited in its application to the details of the particular arrangement shown, since the invention is capable of other embodiments. Also, the terminology used herein is for the purpose of description and not of limitation.

DETAILED DESCRIPTION OF THE
PREFERRED EMBODIMENTS

Below follow some basic definitions as used herein:

Ceramic and porcelain enamel: A soft melting glass similar in all cases and like other ceramic glazes, composed of fluxes and alumino-silicates. Porcelain enamels are typically used on metallic surfaces.

Glass frits: Pre-fused glass material which is produced by fritting (the rapid chilling of the molten glassy material), then ground to a powder. Frits are typically employed as a constituent in a glaze.

Mixed metal oxides: An oxide compound consisting of more than one metal oxide.

Glass frits generally are composed of alkali metal oxides, alkaline earth metal oxides, silica, boric oxide and transition metal oxides. In specific, additional information is known about the marking materials Cerdec 29-1060 Amber stain, which contains silver sulfide, copper, copper oxide, barium sulfate, iron sulfide, calcium hydroxide and crystalline silica. Also, Cerdec 29-1777 Amber stain is also known to contain silver sulfide, copper oxide, copper-iron sulfide and kaolin clay. Also, Cerdec 29-346 Amber stain is known to contain copper, copper oxide, silver sulfide, barium sulfate, iron sulfate, iron oxide, and crystalline silica. Also, Cerdec

8

24-2702 black stain is known to contain lead borosilicate frit, C.I. pigment black 27 (containing cobalt compounds, iron oxide chromium compound), C.I. pigment black 30 (containing nickel, manganese and chromium compounds and iron oxide) and C.I. pigment blue 72 (containing cobalt compound).

Comparable mixed metal oxide and glass frit materials can be secured through manufacturers such as Bayer Company, Cookson Matthey Zircon, Ferro Corp., Cerdec Corp., E.I. duPont de Nemours & Co., Hoechst Celanese Corp., and Dow Chemical Co.

The method of this invention is especially suitable for marking metals, plastics, glasses, and glass ceramics. Glasses and glass ceramics are well known to the person skilled in the art and described, for example, in Ullmanns Enzyklopädie der technischen Chemie, 4th edition, Vol. 12, pp. 317–366.

By ceramic materials are meant inorganic, non-metallic, high-melting materials that are usually referred to in the literature as clay ceramics and special ceramics. Examples thereof are oxides in crystalline or glassy form, e.g. alkali metal or alkaline earth metal aluminosilicates or aluminoborates, as well as non-oxides such as carbides, nitrides, and silicides. For further examples, attention is drawn to Ullmanns Enzyklopadie der techn. Chemie, 4th Edition, Vol. 13, pp. 712–716.

Glazes are classified chemically as follows:

1. Bases, the conspicuously fluxing agents, represented by alkali metal oxides, the alkaline earth metal oxides, zinc oxide, lead oxide and many coloring oxides or chromophores.

2. Intermediates, which includes amphoteric oxides, a group from which alumina is the common example and to which ferric, chromic, manganic, and other oxides are sometimes assigned. Boric acid is sometimes considered a member of this group.

3. Acids, of which silico, phosophoric oxide, zirconia and flourine belong.

Glazes are glassy coatings applied to a ceramic material and having a composition very similar to that of glass (op. Cit., pp. 722–724). Typical examples of glazes are those consisting of quartz, clay (especially the mica-based and structured clays recited in the cited reference), alkali metal oxides, alkaline earth metal oxides, and low-melting oxides (such as $Na_2O$, $K_2O$, CaO, BaO, and PbO) as fluxes.

Depending on the utility, the materials to be marked may be colorless, white, black or colored with a suitable pigment on which the resulting marking layer additionally provides contrast or which contains a pigment (e.g. metal, glass, ceramic or organic colorant).

In the practice of this invention, the laser or diode utilized must provide a relatively low energy level ranging from 1 to 20 watts at the workpiece surface to be marked. Commercially available and conventionally powered laser marking systems operating in either continuous wave or pulsed mode can be used. For example, a pulsed, Nd:YAG laser with a maximum capacity of 100 watts and pulse durations of 5 to 200 microseconds at a frequency of 20 kHz or higher could be used. However, use of this type of laser would require reducing the effect of the radiant energy using mechanical apertures and/or neutral density filters and/or polarizers and/or de-focusing the beam at the surface of the workpiece as shown in FIG. 10.

The workpiece illustrated in FIG. 7 was created using a Lumonics Lightwriter™ lamp pumped Nd:YAG laser marker configured with a 2 mm mechanical aperture and a

US 6,313,436 B1

9

polarizer which produced a CW beam focused by a 100 mm by 100 mm flat field lens to a spot size of approximately 125 microns with measured power of 5 watts and which was moved by a beam steering mechanism at a speed of 200 mm/second.

Additionally, a Uniphase Stablite™ diode pumped Nd:YAG laser has been used which produced a 700 micron diameter CW beam focused using a 50 mm lens to a spot size of 90 microns with measured power of 3.1 watts and moved manually at a speed of approximately 50 mm/second.

In FIG. 10, the conventionally powered laser beam 100, 105 is de-focused at the surface 109 of the workpiece 106 by allowing the laser beam 100 to pass through the focal plane 102 and impinge upon the marking material 103 applied to the surface 109 of the workpiece 106. It has been shown that placing the workpiece as shown below the focal plane using the diverging radiant energy 105 is preferred over the use of the converging radiant energy 100 above the focal plane 102. The resulting spot 104 has a diameter DLL in the preferred mode of 5 to 200 microns. The direction of movement 108 of the diverging laser beam 105 on the surface of the marking material 103 is shown. A beam steering mechanism 110 moves the beam. The resulting bonded layer comprising the mark 107 is shown in contrast to the remaining non-irradiated marking material 103 on the surface 109 of the workpiece 106.

In the preferred embodiment of this invention, a less expensive, less powerful air-cooled laser which consumes considerably less electric energy, such as a direct diode or diode pumped laser, is used. Optimal results are generally obtained using 5 watts of average power with a spot size of 125 microns moving at a speed of 200 mm/sec across the surface of the marking material.

Lasers whose parameters can be readily adjusted, for example, pulse content and pulse duration, permit the best possible adaptation to the requirements of the marking material 103 and the composition of workpiece 106 to be marked. In no case is a preheating of the workpiece 106 necessary. The proper radiant energy is that at which the marking material absorbs energy most efficiently. It is a major advantage of the present invention that only a single pass of the irradiating beam is required to practice the invention. In all experiments the inventive process was practiced at a room temperature of approximately 700° F. Furthermore, it is believed that both hot and cold substrate materials can be marked during their production using the inventive process.

In an alternate embodiment of the invention, the workpiece may be moved under a stationary laser beam at similar relative speeds to produce the desired mark.

Preferably, the relative speeds taught herein are executed by the use of a computer controlled workpiece movement mechanism (not shown) for example, an X–Y and/or rotary stage using stepper and/or servo motors as supplied by Newport Corporation and/or a beam steering mechanism (not shown) for example the CPM™ Scan Head using gala-mirrors as supplied by General Scanning, Inc. Alternately, beam steering can be effected, for example, acousto-optically, holographically, or by polygon scanners.

The preferred combinations of marking materials and workpiece composition are listed below:

10

TABLE I

| | Marking Materials | Substrate Materials |
|---|---|---|
| 1. | Glass frit with energy absorbing enhancers and certain colorants and/or pigments including porcelain enamels | Glass, ceramic, porcelain and certain metals including aluminum, brass steel and stainless steel |
| | PREFERRED EMBODIMENT FOR THIS APPLICATION | |
| 2. | Mixed metal oxides with energy absorbing enhancers and certain colorants and/or pigments | Metals including aluminum brass copper, nickel, tin steel, stainless steel, and certain glasses, ceramics and plastics |
| 3. | Mixed organic pigments with energy absorbing enhancers | Plastics including ABS, PVC, Nylon ™, Delrin ™, Teflon ™ and Plexiglas ™ |

Use of and/or the combination of different compositions of marking material, second and/or subsequent applications of marking material and/or the adjustment of laser parameters will result in variations in the durability, appearance, and structural form of the resulting mark. Thus, a person skilled in the art of laser marking can create a wide variety of marking characteristics to suit his requirements. All of these marking characteristics can be achieved with the use of a single low-power, low-cost air-cooled diode laser. Furthermore, an infinite variety of colors can be achieved. These features are a significant advance in the art of surface marking.

Preparation of the marking material, in liquid form, can, for example, occur through low shear mechanical mixing, high shear mechanical mixing, ultrasonic mixing and/or milling. The marking material, in liquid form, can be manually or automatically applied to the substrate surface at the desired thickness by: a) hand-painting it onto the surface; b) mechanically brushing or rolling it onto the surface; c) spraying it onto the surface; d) pad or screen printing it onto the surface; or e) flood coating the substrate surface and then scraping across the surface of the marking material on guides of desired thickness or spinning the substrate to achieve the desired thickness. Excess material not bonded to the substrate surface can be removed by conventional cleaning processes. In high-volume applications, the unused marking material can be recovered from the cleaning process and reused.

The marking material in solid form can be manually or automatically brought into contact with the substrate surface at the desired thickness by: a) pressure sensitive, slightly self-adhesive labels; or b) non-adhesive tape pressed against the substrate surface by a mechanical apparatus. The label and tape fabrication insure the proper and uniform thickness and composition of the marking material then brought into contact with the substrate surface. Additional materials used in the application of the marking material in liquid form or in the fabrication of tape and/or labels are substantially vaporized into smoke and vented away from the substrate. A laminar air flow across the surface of the workpiece is created by such venting and/or exhausting equipment insuring a consistent localized environment in which the inventive process can occur.

Transfer Marking Medium

In a particular aspect, the invention provides transfer marking media for use in the laser marking process.

These media include a carrier to which is applied, or into which is incorporated, the necessary marking material. Of

US 6,313,436 B1

11

12

particular note are pressure sensitive, slightly self-adhesive or non-adhesive tape or labels to be brought into contact with the substrate surface by a mechanical apparatus. Suitable carriers are, for example, paper and flexible plastic films such as polyester, polyethylene, and polypropylene films.

The marking materials can be formulated into a coating composition which is coated onto the carrier surface. The composition can, for example, be in the form of a pressure sensitive adhesive formulation. Alternatively, the marking material can be, for example, incorporated into the flexible polymer film of the carrier such as polyester, polyethylene, or polypropylene.

The marking material can also take the form of the so-called glass enamels. These enamels generally incorporate a lead-containing or preferably a lead-free glass frit, a colorant, and/or colored glass frit and an organic carrier.

These enamels are conventionally applied onto glass or ceramic or other non-porous substrates and fired at temperatures in the neighborhood of 6000 to 9000° C. to fuse the enamel to the surface of the workpiece (the substrate). In the present invention, the enamel can be coated in the desired thickness on the desired carrier to form the transfer marking medium.

The transfer marking medium containing the marking material either coated thereon or incorporated therein is then brought into contact with the surface of the substrate to be marked and contacted with the laser or diode based energy to effect the necessary marking. Following the application of the laser or diode based energy, the excess marking medium is removed from the substrate when the carrier is separated from the substrate surface.

The marking materials may be defined as those materials which, upon application of sufficient laser or diode based energy to produce the necessary heat, bond to glass or ceramic or other non-porous substrate to provide an enhanced contrast and/or color marking on the substrate. Low temperature glass frits can be used alone or in combination with other materials.

Examples of suitable inorganic pigments which might be used are described in Ullmanns Enzyklopädoe der techn. Chemie, 4th Edition, Vol. 14, pp. 1–12, and in the publication of the Dry Color Manufacturers' Association (DCMA) "Classification and Description of the Mixed Metal Oxide Inorganic Colored Pigments", Second Edition, January, 1982. These pigments are "ceramic colorants", for example, compounds of oxides of different transition elements or compounds of oxides of transition elements and of metal oxides of elements of the main groups of the Periodic System, e.g., having the spinel-type structure, and also compounds such as zirconium silicate, zirconium oxide or tin oxide, the crystal lattice of which contains ions of transition metals or rare earth metals, as e.g., in zirconium vanadium blue, in zirconium preseodyme yellow and in zirconium iron pink, or the cadmium sulfides and cadmium sulfoselenides as well as inclusion pigments containing such compounds, e.g., based on zirconium silicate, tin oxide, zirconium oxide or quartz.

Examples of typical ceramic colorants are cobalt aluminates, chrome tin pink sphere, chrome tin orchid cassitorite, tin vanadium yellow, zirconium preseodyme yellow, zirconium iron pink, the cadmium sulfoselenides and cadmium sulfides and the inclusion compounds containing them, e.g., zirconium silicate, tin oxide, zirconium oxide or quartz; copper-red, manganese pink, colcothar, the iron oxide brown pigments such as iron oxides, iron-chrome-alumina spinels, manganese-alumina spinels, wine-chrome spinels, iron-alumina spinels, zinc-iron spinels, nickel-iron spinels, manganese-chrome spinels, zinc-iron-chrome spinels, tin oxide, titanium dioxide and titanates, e.g., nickel-antimony titanate, chrome-antimony titanate or manganese-antimony titanate.

Preferred pigments are zirconium vanadium yellow, preseodyme yellow, the iron oxide brown pigments such as zinc-iron-chrome spinels and zirconium iron pink, titanium dioxide, titanates, cadmium sulfides and cadmium sulfoselenides as well as inclusion pigments containing such compounds.

Examples of laser or diode based energy sources to be used are solid state pulsed and/or CW lasers such as ruby lasers or frequency multiplied Nd:YAG lasers, pulsed lasers with booster such as pulsed dye lasers or Raman shifter, and also continuous-wave lasers with pulse modifications (Q-switch, mode locker), for example, on the basis of CW Nd:YAG lasers with or without frequency multiplier or CW ion lasers (Ar, KR), as well as pulsed metal vapor lasers; for example, copper vapor lasers or gold vapor lasers, or high-capacity pulsed or continuous wave semi-conductor diode lasers, and also pulsed gas lasers such as $CO_2$ and excimer.

What is preferred is a low-power (six watts), low-cost continuous-wave diode laser. Any of the other higher power lasers need to have the power partially attenuated by known means including mechanical apertures and/or neutral-density filters and/or polarizers and/or low-efficiency mirrors.

The wavelength to be selected for the laser or diode based energy source is that at which the marking material, with or without the energy absorbing enhancer absorbs the radiation most efficiently.

Several different methods are suitable for laser marking, for example: a) the mask method whereby the area to be marked is uniformly coated with the marking material and the radiant energy passes through a fixed, data specific mask and impinges onto the marking material to produce the desired mark; and b) the dot-matrix method whereby the area to be marked is uniformly coated with the marking material and the radiant energy passes through a computer controlled, changeable data, dot-matrix mask and impinges onto the marking material to produce the desired mark; and c) the beam deflection method whereby the area to be marked is uniformly coated with the marking material and the radiant energy passes through a beam steering head and impinges onto the marking material to produce the desired mark; and d) the X–Y plotter method whereby the area to be marked is uniformly coated with the marking material and the radiant energy moves on a gantry type X–Y mechanism utilizing mirrors and/or fiber-optics and impinges onto the marking material to produce the desired mark; and e) the part moving method whereby the area to be marked is uniformly coated with the marking material and the workpiece to be marked is moved using an X–Y motor driven stage under a stationary beam which impinges onto the marking material to produce the desired mark; and f) the area irradiation method whereby data specific marking material is uniformly applied to the surface of the workpiece and the data specific marking area is irradiated by means of a beam steering mechanism or by means of moving the workpiece under a stationary beam. In methods b), c), d), e) and f) the laser is preferably combined with a laser marking system so that the marking material can be irradiated with any, e.g., computer programmed, digits, letters and special symbols where the laser beam strikes the marking material in the most efficent manner possible.

US 6,313,436 B1

13

14

In one particularly important aspect of the invention, the marking materials can be formulated to absorb a narrow band of wavelengths, e.g., approximately 1 micron, and will react with the substrate material when the proper temperature is achieved. In this way, a single optimal power source (laser or diode) can be employed to mark all materials.

Although the present invention has been described with reference to preferred embodiments, numerous modifications and variations can be made and still the result will come within the scope of the invention. No limitation with respect to the specific embodiments disclosed herein is intended or should be inferred.

I claim:

1. A thermally activated, chemically based marking method comprising the steps of:

applying a layer of mixed metal oxide material containing an energy absorbing enhancer to a metal substrate; and

irradiating said layer with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancer in accordance with the form of a marking to be applied, thereby forming a marking layer atop the substrate.

2. The method of claim 1 further comprising the step of providing a laminar air flow across the substrate during the irradiating step.

3. The method of claim 1, wherein the mixed metal oxide material further comprises a colorant, and the energy absorbing enhancer further comprises carbon black.

4. The method of claim 1, wherein the radiant energy beam further comprises a laser beam having an energy level ranging between 1 and 30 watts, a spot size ranging between 5 and 200 microns, and a marking speed along the substrate ranging between 25 and 1000 mm/sec.

5. The method of claim 1, wherein the layer of mixed metal oxide material further comprises a thickness ranging between 5 and 500 microns.

6. The method of claim 1 further comprising the step of starting at a room temperature of about 700° F.

7. A thermally activated chemically based marking method comprising steps of:

applying a material containing a metal oxide comprising an energy absorbing enhancing component to a substrate to be marked in the form of a marking to be applied; and

irradiating said layer with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancing component, thereby forming a marking layer atop the substrate.

8. A thermally activated chemically based marking method comprising the steps of:

applying a layer of mixed metal oxide material containing an energy absorbing enhancer to a substrate selected from the group consisting of aluminum, brass, chrome, copper, nickel, steel, stainless steel, tin, glass, ceramic, porcelain, and plastic; and

irradiating said layer with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancer in accordance with the form of a marking to be applied, thereby forming a marking layer atop the substrate.

9. The method of claim 8 further comprising the step of providing a laminar air flow across the substrate during the irradiating step.

10. The method of claim 8, wherein the energy absorbing enhancer further comprises carbon black.

11. The method of claim 8, wherein the radiant energy beam further comprises a laser beam having an energy level ranging between 1 and 30 watts, a spot size ranging between 5 and 200 microns, and a marking speed along the substrate ranging between 25 and 1000 mm/sec.

12. The method of claim 8, wherein the layer of mixed metal oxide material further comprises a thickness ranging between 5 and 500 microns.

13. The method of claim 8 further comprising the step of starting at a room temperature of about 700° F.

14. The method of claim 8, wherein the mixed metal oxide material further comprises a colorant.

15. The process of claim 8, wherein said mixed metal oxide material comprises at least one member selected from the group consisting of micas and strictured clays.

16. The process of claim 8, wherein said substrate is an unglazed area of a clay ceramic body of a vitreous china fixture.

17. The process of claim 16, wherein the marking material applied is a metal oxide glaze containing a colorant and an energy absorbing enhancer.

18. The process of claim 16, wherein the marking material is applied to a point on a substrate that resides below the plane of a surrounding surface in sufficient quantity to produce a mark having a surface coplaner with the surrounding surface.

19. The process of claim 8, wherein the marking material applied is a glaze containing an energy absorbing enhancer, a metal oxide, and at least one member selected from the group zirconium oxide, metal fluoride and fluorine.

20. A thermally activated chemically based marking method comprising the steps of:

applying a mixed metal oxide material containing an energy absorbing enhancer to a carrier;

placing the carrier in contact with the substrate to be marked; and

irradiating the carrier with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancer in accordance with the form of a marking to be applied, thereby forming a marking layer atop the substrate.

21. A thermally activated chemically based marking method comprising the steps of:

applying a layer of mixed metal oxide material containing an energy absorbing enhancer to a substrate to be marked in the form of a marking to be applied; and

irradiating said layer with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancer, thereby forming a marking layer atop the substrate.

22. The method of claim 21 further comprising the step of providing a laminar air flow across the substrate during the irradiating step.

23. The method of claim 21, wherein the energy absorbing enhancer further comprises carbon black.

24. The method of claim 21, wherein the radiant energy beam further comprises a laser beam having an energy level ranging between 1 and 30 watts and a marking speed along the substrate ranging between 25 and 1000 mm/sec.

25. The method of claim 21, wherein the layer of material containing an energy absorbing enhancer further comprises a thickness ranging between 5 and 500 microns.

26. The method of claim 21 further comprising the step of starting at a room temperature of about 70° F.

27. The method of claim 21, wherein the mixed metal oxide material further comprises a colorant.

28. A thermally activated chemically based marking method comprising steps of:

US 6,313,436 B1

15

16

applying a layer having a mixed metal oxide component and an energy absorbing enhancing component to a substrate selected from the group consisting of aluminum, brass, chrome, copper, nickel, steel, tin, glass, ceramic, and plastic; and

irradiating said layer with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancing component, thereby forming an adhered layer atop the substrate.

**29**. A thermally activated, chemically based marking method comprising steps of:

applying a layer of a marking material comprising at least one metal compound to a markable substrate comprising at least one material selected from the group consisting of metals, glasses, ceramics and plastics; and

irradiating said layer with a radiant energy beam having a wavelength selected to be absorbed by said marking material, thereby forming a bonded layer atop said substrate.

**30**. The method of claim **29** wherein said metal compound comprises a metal oxide.

**31**. The method of claim **29** wherein said marking material further comprises at least one energy absorbing enhancing component.

**32**. The method of claim **29** wherein said marking material further comprises at least one colorant or pigment.

**33**. The process of claim **29**, wherein said at least one metal compound is a metal carbonate.

**34**. The process of claim **29**, wherein said at least one metal compound is an organometallic compound.

**35**. The marking method of claim **29**, wherein said marking material additionally comprises organic materials and glass frit.

**36**. The marking method of claim **29**, wherein said bonded layer atop said substrate is electrically conductive.

**37**. A thermally activated chemically based marking method comprising steps of:

applying material having a metal oxide component and comprising an energy absorbing enhancing component to a carrier;

placing the carrier in contact with the substrate to be marked; and

irradiating the carrier with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancing component in accordance with the form of a marking to be applied, thereby forming a marking layer atop the substrate.

**38**. A thermally activated, chemically based marking method comprising the steps of:

applying a layer having a metal oxide component and comprising an energy absorbing enhancing component to a metal substrate; and

irradiating said layer with a radiant energy beam having a wavelength selected to excite the energy absorbing enhancing component, thereby forming an adhered layer atop the substrate.

\*    \*    \*    \*    \*

# EXHIBIT C

## THERMARK HOLDINGS, INC.

### CONFIDENTIAL INFORMATION AND
### INVENTION ASSIGNMENT AGREEMENT

As a condition of my engagement as a consultant by TherMark Holdings, Inc., its subsidiaries, affiliates, successors or assigns ("TherMark"), and in consideration of engagement as a consultant by TherMark and my receipt of the compensation now and hereafter paid to me by TherMark, I agree to the following:

**1.    Independent Contractor.**

I understand and acknowledge that engagement as a consultant by TherMark is for an unspecified duration and constitutes an independent contractor relationship.  I also understand that any representation to the contrary is unauthorized and not valid unless obtained in writing and signed by the the Chairman of the Board of TherMark.

**2.    Confidential Information.**

**A.    TherMark Information.**  I agree at all times during the term of engagement as a consultant by TherMark and thereafter, to hold in strictest confidence, and not to use, except for the benefit of TherMark, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of TherMark, any Confidential Information of TherMark, except under an agreement duly authorized and executed by TherMark.  I understand that "Confidential Information" means any non-public information that relates to the actual or anticipated business or research and development of TherMark, technical data, trade secrets or know-how, including, but not limited to, research, product plans or other information regarding TherMark's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of TherMark on whom I called or with whom I became acquainted during the term of my engagement as a consultant by TherMark), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information.  I further understand that Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

**B.    Former Employer Information.**  I agree that I will not, during my engagement as a consultant by TherMark, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of TherMark any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

**C.    Third Party Information.**  I recognize that TherMark has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on TherMark's part to maintain the confidentiality of such information and to use it only for certain limited purposes.  I agree to hold all such confidential or proprietary information in the strictest

1

confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for TherMark consistent with TherMark's agreement with such third party.

**3.    Inventions.**

A.    **Inventions Retained and Licensed.**  I have attached hereto, as <u>Exhibit A</u>, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my engagement as a consultant by TherMark (collectively referred to as "<u>Prior Inventions</u>"), which belong to me, which relate to TherMark's proposed business, products or research and development, and which are not assigned to TherMark hereunder; or, if no such list is attached, I represent that there are no such Prior Inventions.  If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Inventions in <u>Exhibit A</u> but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such inventions has not been made for that reason.  If in the course of my engagement as a consultant by TherMark, I incorporate into a TherMark product, process or service a Prior Invention owned by me or in which I have an interest, I hereby grant to TherMark a nonexclusive, royalty-free, fully paid-up, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use and sell such Prior Invention as part of or in connection with such product, process or service, and to practice any method related thereto.

B.    **Assignment of Inventions.**  I agree that I will promptly make full written disclosure to TherMark, will hold in trust for the sole right and benefit of TherMark, and hereby assign to TherMark, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements, designs, discoveries, ideas, trademarks or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am engaged as a consultant by TherMark (collectively referred to as "<u>Inventions</u>"), except as provided in Section 3.C below.  I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment with TherMark and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.  I understand and agree that the decision whether or not to commercialize or market any invention developed by me solely or jointly with others is within TherMark's sole discretion and for TherMark's sole benefit and that no royalty will be due to me as a result of TherMark's efforts to commercialize or market any such invention.

C.    **Inventions Assigned to the United States.**  I agree to assign to the United States government all my right, title, and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between TherMark and the United States or any of its agencies.

D.    **Works for Hire.**  I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my engagement and which are protectable by copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101).

THI 003041

E.  **Maintenance of Records.**  I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my engagement as a consultant by TherMark.  The records will be in the form of notes, sketches, drawings, and any other format that may be specified by TherMark.  The records will be available to and remain the sole property of TherMark at all times.

F.  **Obligation to Keep TherMark Informed.**  During the period of my engagement, I will promptly disclose to TherMark fully and in writing all Inventions authored, conceived or reduced to practice by me, either alone or jointly with others in performing services for TherMark hereunder.  In addition, I will promptly disclose to TherMark all patent applications filed by me or on my behalf within a year after termination of my consulting relationship with TherMark to the extent such patent applications relate to TherMark's business.  At the time of each such disclosure, I will advise TherMark in writing of any Inventions that I believe fully qualify for protection under California Labor Code Section 2870 ("Section 2870"); and I will at that time provide to TherMark in writing all evidence necessary to substantiate that belief.  TherMark will keep in confidence and will not use for any purpose or disclose to third parties without my consent any confidential information disclosed in writing to TherMark pursuant to this Agreement relating to Inventions that qualify fully for protection under the provisions of Section 2870.  I will preserve the confidentiality of any Invention that does not fully qualify for protection under Section 2870.

G.  **Patent and Copyright Registrations.**  I agree to assist TherMark, or its designee, at TherMark's expense, in every proper way to secure TherMark's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to TherMark of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which TherMark shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to TherMark, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement.  If TherMark is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to TherMark as above, then I hereby irrevocably designate and appoint TherMark and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

**4.  Conflicting Employment or Engagements**

I agree that, during the term of my engagement as a consultant by TherMark, I will not engage in any other employment, occupation or consulting directly related to TherMark's primary business of delivering permanent variable marks in which TherMark is now involved, nor will I engage in any other activities that conflict with my obligations to TherMark.

3

THI 003042

**5.      Returning TherMark Documents**

I agree that, at the time of leaving my engagement as a consultant by TherMark, I will deliver to TherMark (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my engagement as a consultant by TherMark or otherwise belonging to TherMark, its successors or assigns, including, without limitation, those records maintained pursuant to Paragraph 3.D. In the event of the termination of my engagement as a consultant by TherMark, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit B.

**6.      Notification of New Customer of Employer**

In the event that I leave my engagement as a consultant by TherMark, I hereby grant consent to notification by TherMark to any new relevant customer of my employer, Momentum Venture Management, LLC ("MVM") about my rights and obligations under this Agreement.

**7.      Solicitation of Employees**

I agree that for a period of twelve (12) months immediately following the termination of my relationship with TherMark for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of TherMark's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of TherMark, either for myself or for any other person or entity.

**8.      Conflict of Interest Guidelines**

I agree to diligently adhere to the Conflict of Interest Guidelines attached as Exhibit C hereto.

**9.      Representations**

I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my engagement as a consultant by TherMark. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

**10.     Arbitration and Equitable Relief**

          **A.      Arbitration.**  In consideration of my engagement as a consultant by TherMark, its promise to arbitrate all consulting-related disputes and my receipt of the compensation, pay raises and other benefits paid to me by TherMark, at present and in the future, I agree that any and all controversies, claims, or disputes with anyone (including TherMark and any employee, officer, director, shareholder or benefit plan of TherMark in their capacity as such or otherwise) arising out of, relating to, or resulting from my engagement as a consultant by TherMark or the termination of my engagement as a consultant by TherMark, including any breach of this Agreement, shall be

4

THI 003043

subject to binding arbitration under the arbitration rules set forth in California Code of Civil Procedure Section 1280 through 1294.2, including Section 1283.05 (the "rules") and pursuant to California law. Disputes which I agree to arbitrate, and thereby agree to waive any right to a trial by jury, include any statutory claims under state or federal law, including, but not limited to, claims under Title VII of the Civil Rights Act of 1964, the Americans With Disabilities Act of 1990, the age discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the California Fair Employment and Housing Act, the California Labor Code, claims of harassment, discrimination or wrongful termination and any statutory claims. I further understand that this Agreement to arbitrate also applies to any disputes that TherMark may have with MVM.

B.   **Procedure.** I agree that any arbitration will be administered by JAMS and that the neutral arbitrator will be selected in a manner consistent with its national rules for the resolution of independent contractor disputes. I agree that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication and motions to dismiss and demurrers, prior to any arbitration hearing. I also agree that the arbitrator shall have the power to award any remedies, including attorneys' fees and costs, available under applicable law. I understand TherMark will pay for any administrative or hearing fees charged by the arbitrator or JAMS except that I shall pay the first $125.00 of any filing fees associated with any arbitration I initiate. I agree that the arbitrator shall administer and conduct any arbitration in a manner consistent with the rules and that to the extent that the JAM's national rules for the resolution of independent contractor disputes conflict with the rules, the rules shall take precedence. I agree that the decision of the arbitrator shall be in writing.

C.   **Remedy.** Except as provided by the rules and this Agreement, arbitration shall be the sole, exclusive and final remedy for any dispute between me and TherMark. Accordingly, except as provided for by the rules and this Agreement, neither I nor TherMark will be permitted to pursue court action regarding claims that are subject to arbitration. Notwithstanding, the arbitrator will not have the authority to disregard or refuse to enforce any lawful company policy, and the arbitrator shall not order or require TherMark to adopt a policy not otherwise required by law which TherMark has not adopted.

D.   **Availability of Injunctive Relief.** In addition to the right under the rules to petition the court for provisional relief, I agree that any party may also petition the court for injunctive relief where either party alleges or claims a violation of the independent contractor, confidential information, invention assignment agreement between me and TherMark or any other agreement regarding trade secrets, confidential information, non-solicitation or Labor Code §2870. I understand that any breach or threatened breach of such an agreement will cause irreparable injury and that money damages will not provide an adequate remedy therefor and both parties hereby consent to the issuance of an injunction. In the event either party seeks injunctive relief, the prevailing party shall be entitled to recover reasonable costs and attorneys fees.

E.   **Administrative Relief.** I understand that this Agreement does not prohibit me from pursuing an administrative claim with a local, state or federal administrative body such as the department of fair employment and housing, the equal employment opportunity commission or the workers' compensation board. This Agreement does, however, preclude me from pursuing court action regarding any such claim.

5

THI 003044

F.   **Voluntary Nature of Agreement.**   I acknowledge and agree that I am executing this Agreement voluntarily and without any duress or undue influence by TherMark or anyone else.  I further acknowledge and agree that I have carefully read this Agreement and that I have asked any questions needed for me to understand the terms, consequences and binding effect of this Agreement and fully understand it, including that **I am waiving my right to a jury trial**.  Finally, I agree that I have been provided an opportunity to seek the advice of an attorney of my choice before signing this Agreement.

**11.   General Provisions.**

A.   **Governing Law; Consent to Personal Jurisdiction.**   This Agreement will be governed by the laws of the State of California.  I hereby expressly consent to the personal jurisdiction of the state and federal courts located in California for any lawsuit filed there against me by TherMark arising from or relating to this Agreement.

B.   **Notices.**   Any notices required or permitted hereunder shall be given to the appropriate party at the address specified below or at such other address as the party shall specify in writing.  Such notice shall be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three (3) days after the date of mailing.

C.   **Entire Agreement.**   This Agreement sets forth the entire agreement and understanding between TherMark and me relating to the subject matter herein and supersedes all prior discussions or representations between us including, but not limited to, any representations made during my negotiations, whether written or oral.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the Chairman of TherMark and me.  Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

D.   **Waiver.**  No waiver by TherMark of any breach of this Agreement shall be a waiver of any preceding or succeeding breach.  No waiver by TherMark of any right under this Agreement shall be construed as a waiver of any other right.  TherMark shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

E.   **Legal Advice; Construction.**   I acknowledge that, in executing this Agreement, I have had the opportunity to seek the advise of independent legal counsel, and I have read and understood all of the terms and provisions of this Agreement.  This Agreement shall not be construed against any party by reason of the drafting or preparation hereof.

F.   **Severability.**   If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.  If moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

6

THI 003045

      G.     **Successors and Assigns.**  This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of TherMark, its successors, and its assigns.

7

THI 003046

I have read this Agreement carefully and understand its terms.  This Agreement shall be effective as of the date of my earliest engagement as a consultant by TherMark.


Date: _____4/21/06_____                    _____
                                               Signature
                                               _____
                                               Name of Consultant (typed or printed)


8

THI 003047

**Exhibit D**

## SEPARATION AGREEMENT AND MUTUAL RELEASES

This Separation Agreement and Mutual Releases (hereinafter referred to as the ("Agreement") is deemed to have been made and entered into on and as of July 31, 2007, by and between TherMark Holdings, Inc., a Delaware corporation (hereinafter referred to as "TherMark"), Paul W. Harrison, an individual (hereinafter referred to as "Employee"), and Permanent Impressions, Inc. ("Permanent Impressions"), and is made in light of the following circumstances:

Whereas, Employee has been employed by TherMark as TherMark's Chief Technology Officer and Secretary pursuant to that certain Employment Agreement, dated April 21, 2006 (the "Employment Agreement"):

Whereas, Employee desires to substantially reduce his efforts on behalf of TherMark so that he can focus more of his time and energy on behalf of his business conducted under the name "Permanent Impressions"; and

Whereas, TherMark wishes to work closely with Employee and Permanent Impressions to drive the success of both companies;

Now therefore, in consideration of the covenants and conditions hereto, the parties agree as follows:

1. **Resignation by Employee.** Effective as of the date hereof, Employee resigns as the Chief Technology Officer and Secretary of TherMark. Employee will not resign as Chairman of the Board of Directors of TherMark.

2. **Termination of Employment Agreement.** Effective as of the date hereof and in return for the good and valuable consideration provided for under the Agreement, Employee and TherMark hereby agree that the Employment Agreement shall be deemed to have been terminated and that Employee is waiving all right to those benefits otherwise provided under

1

the Employment Agreement, including but not limited to severance and health benefits. Notwithstanding the foregoing, Employee and TherMark agree that the provisions of Section 6 and 7 of the Employment Agreement shall remain in full force as well as all provisions of the Confidential Information and Invention Assignment Agreement executed on April 21, 2006 ("The Confidential Information Agreement"), except to the extent that the terms of this Agreement conflicts with the Confidential Information Agreement, this Agreement shall supersede the Confidential Information Agreement.

3. **Term**. The initial term of this Agreement shall commence as of the date hereof and shall end January 31, 2008.

4. **Consulting Relationship**. Employee and Permanent Impressions agree that during this Agreement, they will provide consulting and advisory services to TherMark as requested by Joel Assaraf, CEO of TherMark. Permanent Impressions will receive $13,500 gross per month for the services of Employee and Permanent Impressions, payable on or before the 15th day of every month of the initial term, less any accounts receivable of Permanent Impressions that are not then current. As certain payments have already been made to the Employee in August, the amount due to PI on August 31, 2007 shall be $13,500 less $6,409.50 already paid, or $7,090.50.

5. **Consulting Responsibilities**. Prior to the first full payment and as a condition precedent to this Agreement, TherMark and Permanent Impressions will enter into an agreement that, among other things, will address:

- The licensing relationship between the two parties
- Invoice and payment logistics

2

- Confirmation via a W-9 form of PI's corporate status (to make clear that tax withholding burden is PI's and not TherMark's)

As a further condition precedent this Agreement, Employee shall deliver to the CEO of TherMark, paper and/or electronic documents (including emails) in his possession relating to the following:

- Operating Agreement for TherMark LLC

- All other original legal documents related to TherMark LLC

- Concept/scope documents related to TherMark Technology usage and its marking applications for automotive catalytic converters (to be delivered by 10/1/07)

- Concept/scope documents related to TherMark Technology dry transfer tape automated feeding mechanisms for, but not limited to, automotive glass vehicle identification number marking (Volkswagen/Skoda application in Czech Republic) (to be delivered by 10/1/07)

- Written specifications for the two diode-pumped solid state lasers in the applications laboratory that would be sufficient to advertise to prospective buyers.


During the initial term of this Agreement, Employee shall (a) assist Joel Assaraf in his takeover of all budgeting and other responsibilities previously undertaken by Employee on behalf of TherMark, (b) transfer of all assets and aspects of TherMark's laboratory operations to TherMark from Employee and/or Permanent Impressions, including but not limited to the lease with Geneva Capital for Trotec Speedy 300 CO2 Laser, (c) remove Omni Leasing (laser equipment for Permanent Impressions as named insured on TherMark Holding's Hartford

3

Casualty Business Owners Policy (# 72SBANU3880): (d) eliminate any and all actual and potential conflicts of interest between TherMark and its wholly-owned subsidiary, TherMark LLC, on the one hand, and Employee, Employee's spouse and Permanent Impressions, on the other hand, and (e) provide Joel with any requested assistance or advice on other aspects of TherMark's operations including, but not limited to, TherMark GmbH. Employee shall not accrue nor submit any expenses related to such assistance except as specifically approved, in writing, in advance by Joel Assaraf

6. **Life Insurance Policy.** TherMark agrees that $300,000 term life insurance policy on the life of Employee, owned by Employee and paid for by TherMark, shall be paid for by Thermark so long as Employee remains a member of TherMark's Board of Directors, and that Employee's spouse, as primary beneficiary, and Employee's daughter, as secondary beneficiary, shall continue to be named as beneficiaries.

7. **Employee's Other Covenants**

(a)      Employee agrees that he shall not, without TherMark's prior written consent: (i) plan for, acquire any substantial financial interest in or otherwise perform any services for compensation for any business or entity involved in the industry within which TherMark operates and which is not affiliated with TherMark (including any business or any that has a business relationship with TherMark) during the term of this Agreement, other than Permanent Impressions; (ii) employ except, attempt to employ or solicit for employment by others, any of TherMark's employees during the term of this Agreement and for a period of one (1) year thereafter; or (iii) solicit, or cause to be solicited, any of TherMark's customers or previously identified prospective customers, the identities and profiles of which customers and

4

HAR 000816

previously-identified prospective customers Employee acknowledges are treated as trade secrets by TherMark, for a period of two(2) years thereafter.

(b)     Employee acknowledges that a breach by him of any of the provisions of Section 7(a) above will cause TherMark great and irreparable harm and that TherMark will be entitled to injunctive and other equitable relief to present a breach or threatened breach thereof, without being required to post any bond therefor, in addition to any other remedies that TherMark may have. Employee further agrees that the provisions of Section 6(a) above will be specifically enforceable by TherMark against him in accordance with its terms.

8.   **Publicity.**  TherMark and Employee shall jointly draft, approve and release one or more public announcements directed to TherMark's customers, vendors and other interested parties that Employee has resigned as TherMark's Chief Technology Officer and Secretary to allow Employee to pursue his business conducted through Permanent Impressions on a full-time basis and that Employee remains as TherMark's Chairman of the Board of Directors.

9.   **No Admission of Liability.**  Employee expressly acknowledges TherMark does not admit any liability by entering into this Agreement. TherMark acknowledges that Employee does not admit any liability by entering into this Agreement.

10. **General Release**.  In further consideration of the parties' execution and delivery of this Agreement, Employee, on behalf of himself, his heirs, estate, executors, administrators, successors and assigns, does fully release and discharge TherMark, its successors; assigns; agents, specifically but not limited to Momentum Ventures Management LLC and its members; employees; officers; board members other than Employee (collectively "Releasees") from any and all claims to date including but not limited to all actions, causes of action, claims, judgments, obligations, damages, costs, attorneys' fees, demands or liability of whatsoever kind

5

and character. except as prohibited by law. arising out of Employee's employment with. board

membership of. or termination from. TherMark's employment. including but not limited to any

claims relating to wrongful discharge. breach of contract. action for declaratory relief.

intentional infliction of emotional distress. breach of any implied covenant of good faith and

fair dealing. injury to personal reputation. injury to the right of privacy. damages to personal

and family rights, fraud. negligent infliction of emotional distress. negligent misrepresentation.

conspiracy. interference with prospective economic advantage. denial of family care and/or

medical leave under federal and/or California law. wages. insurance benefits. retirement

benefits. deferred compensation benefits. employment discrimination and/or terms of

employment arising under the common law, the First Amendment to the United States

Constitution; the Civil Rights Act of 1964, as amended; the Age Discrimination in Employment

Act of 1967. as amended; the Americans with Disabilities Act of 1990, as amended; the Equal

Pay Act; the Americans with Disabilities Act; the Fair Labor Standards Act; Sections 401 and

409A of the Internal Revenue Code, as amended; the Family Medical Leave Act of 1993; 42

U.S.C. sections 1981-88; Article 1. Section 8 of the California Constitution; California Civil

Code section 51. et seq.; California Government Code section 12940. et seq.; California Labor

Code section 132a; California Labor Code sections 4553 and 4553.1; the California Family

Rights Act: or any other federal, state or County statute. regulation. ordinance, or order relating

to wages. deferred compensation benefits, vacation pay. sick leave, family care leave. insurance

benefits (including but not limited to continuing and/or converting insurance benefits);

retirement benefits, employment discrimination and/or terms of employment, including, but not

limited to, any claim of discrimination and/or harassment based upon race, national origin,

6

marital status, veteran's status, ancestry, religion, physical or mental disability, sex, age, medical condition, sexual orientation, pregnancy and familial status.

**TherMark Holdings, Inc**. on behalf of itself, its successors and assigns does fully release Paul W. Harrison, his heirs, estates, executors and administrators (collectively "Employee Releases") from any claims including but not limited to all actions, causes of action, claims, judgments, obligations, damages, costs, attorneys' fees, demands or liability of whatsoever kind and character based upon actions to date within the course and scope of Employee's duty as Secretary, Chairman of the Board and/or Chief Technology Officer of TherMark. This release does not extend to any actions outside the course and scope of his duties and/or any *ultra vires* acts.

11. **No Assignment**  The Parties represent and warrant that they have not assigned any such claims or authorized any other person or entity to assert such claims on their behalf. Each Party further represents that  it has not filed any claim with any governmental agency or administrative body for any claims, damages or benefits  relating to the other Parties to the Agreement.

12. **Non-Disclosure of Confidential Information**.  Employee understands and agrees that, in the course of his employment with TherMark, Employee has acquired confidential information concerning TherMark's business, which information Employee understands and agrees would be extremely damaging to TherMark if disclosed to any other person or entity. Employee agrees not to disclose any such confidential information, whether written or oral, to anyone other than TherMark or its officers, directors or employees.  Employee understands that such confidential information has been divulged to Employee in confidence.  Employee agrees that he will keep such information secret and confidential, that he will not remove, copy or in

7

any way use, distribute or disclose such information for a period of five years, beginning as of the date of this Agreement.   In view of the nature of Employee's employment and the confidential information which Employee has received during the course of his employment, Employee agrees that TherMark would be irreparably harmed by any violation or threatened violation of the provisions of Section 9 and that, therefore, TherMark shall be entitled to an injunction prohibiting Employee from any violation or threatened violation of its provisions.

13. **Waiver of Civil Code §1542.**   Employee   understands and agrees that this Agreement extends to all claims of any nature, kind, known or unknown, suspected or unsuspected, past or present, arising out of his Employee's employment with and termination of employment with TherMark and, in that regard, Employee acknowledge that he has considered the provisions of section 1542 of the California Civil Code which reads as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release which, if known by him must have materially affected his settlement with the debtor."

Employee hereby waives any rights that he may have under Civil Code section 1542. Employee expressly acknowledges that this Agreement is intended to include in its effect, without limitation, all claims which Employee does not know or suspect to exist in his favor at the time of the execution hereof, and to extinguish such claim or claims.

TherMark acknowledges that it has considered the provisions of section 1542 of the California Civil Code cited above as to the claims it is releasing under this Agreement and hereby waives any rights that it may have under Civil Code section 1542.

14. **Release of Age Discrimination Claims.**   Employee hereby releases any claims he may have against TherMark for age discrimination and Employee acknowledges that:

8

(a)     This Agreement includes a waiver and release of Employee's claims under the Age Discrimination in Employment Act, 29 U.S.C. Section 621, et seq., and the California Fair Employment and Housing Act.

(b)     Employee has the right to consult with an attorney before signing this Agreement.

(c)     Employee has twenty-one (21) days from the date of his receipt of this Agreement to consider this Agreement but he may waive that period by signing it earlier.

(d)     Employee has seven (7) days after signing this Agreement to revoke this Agreement and this Agreement will not be effective until that revocation period has expired. Notice of revocation must be delivered by facsimile or Federal Express next day service to Joel Assaraf, President of TherMark.

15. **Other Proceedings.  The Parties**  shall not initiate or cause to be initiated against the other Parties to the Agreement any compliance review, audit, suit, action, investigation or proceeding of any kind, or voluntarily participate in same, individually or as a representative, as a witness or member of a class, pertaining to any matter related to Employee's employment with TherMark, except as to those claims specifically not released under Section 10 of this Agreement. The Parties represent and warrant that each has not to date initiated any such review, audit, suit, action, investigation or proceeding.

16. **Non-Disparagement.**  Employee agrees that, in exchange for the consideration provided in this Agreement, Employee shall not make any disparaging remarks, comments or statements to anyone either orally or in writing about TherMark, its officers or employees. TherMark agrees that, in exchange for the consideration set forth in this Agreement,

9

TherMark's officers shall not make any disparaging remarks, comments or statements to anyone either orally or in writing about Employee.

17. **Confidentiality.**   Employee and TherMark agree that the terms and fact of this Agreement shall be confidential.  Employee and TherMark agree not to disclose any terms of this Agreement to anyone (other than the parties' attorney(s), accountant(s) and/or financial advisor(s), immediate family members with whom they reside, or as otherwise required by law), including, but not limited to, past, present, and future employees or independent contractors of TherMark or any customers of, or vendors to, TherMark.

18. **Agreement as Evidence in Future Proceedings.**  Employee and TherMark agree that this Agreement may be used as evidence in any subsequent proceedings in which any of the parties allege a breach of this Agreement.

19. **Employee's Acknowledgment**.    EMPLOYEE  FURTHER  STATES  THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT, THAT EMPLOYEE FULLY UNDERSTANDS ITS FINAL AND BINDING EFFECT, THAT EMPLOYEE HAS HAD THE OPPORTUNITY TO CONSULT WITH AN ATTORNEY, THAT THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO, AND THAT EMPLOYEE IS SIGNING THIS AGREEMENT VOLUNTARILY.

20. **Entire Agreement.**   This Agreement contains the entire Agreement between Employee and TherMark as to the subjects herein and, except as expressly stated above, supersedes all prior discussions and Agreements, written or oral, and may be modified only by written Agreement executed by Employee and an authorized agent of TherMark.

10

21. **Attorneys' Fees.** If either party to this Agreement brings an action to enforce his or its rights hereunder, the prevailing party shall be entitled to recover his or its costs and expenses including court costs and attorneys' fees, if any, incurred in connection with such suit.

22. **Applicable Law.** This Agreement is made and entered into in the State of California and in all respects shall be interpreted, enforced and governed in accordance with the laws of the State of California. The language in this Agreement shall not be construed for or against any party and the parties agree to accept equal responsibility for the terms and conditions set forth herein.

23. **Severability.** The provisions of this Agreement are severable. Should any provisions of this Agreement be declared or determined by any court to be illegal or invalid, the validity of the remaining parts, terms or conditions shall not be affected.

24. **Captions.** The captions in this Agreement are solely for the purpose of convenience and no greater or lesser meaning should be attributed to the text of this Agreement based thereon.

25. **Counterparts.** This Agreement may be executed by facsimile and in one or more counterparts which will constitute one Agreement. Each counterpart shall be deemed an original.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Separation Agreement and Mutual Releases on the date set forth above.

11

Permanent Impressions, Inc.

_Paul W. Harrison_
Paul W. Harrison, Chief Executive Officer

By:

_Paul W. Harrison_
Paul W. Harrison
An individual

TherMark Holdings, Inc.

_Joel Assaraf_
Joel Assaraf
President and CEO

Firmwide:83089216.2 625000.2039

12

**Exhibit E**

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT ("Agreement") is made and entered into on and as of April 28, 2008 (the "Effective Date"), among THERMARK HOLDINGS, INC., a Delaware corporation ("THI"), THERMARK, LLC, a Pennsylvania limited liability company and a wholly-owned subsidiary of THI (the "LLC"), PAUL W. HARRISON, an individual ("Harrison"), and PERMANENT IMPRESSIONS, INC., a Nevada corporation ("Consultant"). THI and the LLC are hereinafter collectively referred to as the "Company".

## RECITALS

A.     Company is the owner of a patented process for laser bonding specialty inks and pastes to a variety of surfaces that leaves a permanent, high-contrast, high-resolution mark on such surfaces. Company holds more than 28 patents worldwide for such process.

B.     Harrison is the founder of Company and the principal owner of Consultant. Harrison is a significant shareholder in THI and also is a member of its Board of Directors. Harrison has also previously served as a full-time employee of THI.

C.     As Company's founder, Harrison was the principal inventor of Company's patented process and is steeped in its history and how the process can be enhanced and improved.

D.     Company now desires to retain the services of Consultant, and Consultant desires to render its consulting services to Company, on the terms and conditions set forth in this Agreement. All such consulting services rendered by Consultant hereunder shall be personally performed by Harrison on Consultant's behalf.

## TERMS AND CONDITIONS

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual promises, covenants, agreements representations and warranties contained in this Agreement, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     Company's Retention of Consultant.

(a)     During the Term (as defined in Section 2), Company agrees to retain the services of Consultant to advise it on various technical and other matters relating to Company's business. All material consulting services rendered by Consultant to Company hereunder shall be performed personally by Harrison. Consultant shall perform such general duties, responsibilities and acts as are outlined on Exhibit A attached hereto. Consultant shall also perform such other specific duties, responsibilities and acts as are reasonably assigned to it by Company. Consultant shall take direction from, and shall report directly to, Company's President and Chief Executive Officer, currently Joel Assaraf.

(b)     Consultant accepts such duties and responsibilities to Company and agrees to perform its services conscientiously, to the full extent of its abilities, in an efficient, faithful

480470.3 (T08912.001)                                    1

and businesslike manner and in a manner which does not damage or otherwise adversely reflect upon the business reputation and integrity of Company or its business. It is expected that Consultant shall perform most of such consulting services at Harrison's personal residence and that Consultant shall perform a minimum of 120 hours of consulting services per month on specific projects assigned to it by Company. Notwithstanding the foregoing, Consultant shall travel to Company's business premises or elsewhere, when reasonably requested to do so by Company, to provide Company, its employees, other consultants and others with needed consulting advice. Any requested travel to and from Company's business premises shall be at Company's expense at the rate of $0.50 per mile of travel.

(c)     Unless specifically requested to do so by Company or unless specifically necessary to perform its and his consulting services hereunder, neither Consultant nor Harrison shall communicate with any Company officers (other than Company's President and CEO), other employees, agents or representatives or any vendors or prospective vendors, customers or prospective customers or others having business relationships with Company during the Term.

(d)     Under no circumstances shall Consultant or Harrison have any authority to obligate or incur on behalf of Company any expense, liability or obligation, or to enter into any contract or agreement on behalf of Company with respect to any expense, liability or obligation, without the prior written approval of Company.

(e)     Each of Consultant and Harrison acknowledge that, as a consultant to Company, each of them will owe a fiduciary duty of loyalty to Company and that each of them will use their best efforts to further the interests of Company.

(f)     Within no more than 10 days after the end of each month of the Term, Consultant shall provide Company with a detailed accounting of all consulting services actually provided by Consultant to Company during the immediately preceding month of the Term and the amount of time expended on each discrete task.

2.     Term.  The term ("Term") of Consultant's retention as a consultant under this Agreement shall commence as of the Effective Date and shall continue until terminated as provided in Section 3.

3.     Termination.

3.1     Termination upon Resignation or Death.  This Agreement will automatically terminate upon Consultant's resignation or Harrison's death.  In the event of Consultant's resignation or Harrison's death, Company will only be required to pay Consultant's consulting fees through the date of Consultant's resignation or the date of Harrison's death.

3.2     Termination for Material Breach.  Company may terminate Consultant's consulting services for Material Breach (as hereinafter defined), effective upon delivery of written notice by Company to Consultant and Harrison, in which event Consultant's consulting services to Company under this Agreement will terminate on the date specified in such notice. For purposes of this Agreement, "Material Breach" means:

HAR 000804

(a)     Harrison has been intoxicated or under the influence of illegal drugs while performing any of his duties and responsibilities on behalf of Consultant hereunder;

(b)     Consultant or Harrison has been convicted of any felony involving violence, fraud or moral turpitude;

(c)     Consultant or Harrison has embezzled any property belonging to Company or has willfully injured Company or any of Company's tangible or intangible property;

(d)     Consultant or Harrison has engaged in conduct that constitutes a breach of Consultant's or Harrison's fiduciary duty of loyalty to Company to further the interests of Company;

(e)     Consultant or Harrison has been grossly negligent or reckless in the performance of its or his duties and responsibilities hereunder;

(f)     Harrison shall have initiated, or otherwise participated in, any actions, either in his capacity as a stockholder of Company or in his capacity as a director of Company, which seek a change in Company's management and/or a change in control of Company's Board of Directors, as such Board of Directors presently exists or as such Board of Directors is presently proposed to be expanded at Company's 2008 annual meeting of stockholders, unless such change has been initiated by Company's directors representing the interests of the holders of its Series A Preferred Stock; or

(g)     Consultant or Harrison has continued to be in breach of this Agreement or has continued to have failed in any respect to perform its or his duties and responsibilities hereunder, in either case, after having received at least 15 days' prior written notice from Company specifying the nature of such breach or failure and what needs to be done to cure such breach or failure to perform.

In the event that Company terminates this Agreement for Material Breach on the part of Consultant and/or Harrison, Company's only obligation shall be to pay Consultant's then monthly consulting fees through the date of such termination.

            3.3     Termination For Any Reason.     Either Company or Consultant may terminate this Agreement for any reason upon 30 days' prior written notice to the other; provided that, in the event Company terminates this Agreement for any reason other than for Material Breach on the part of Consultant and/or Harrison at any time prior to the date which is one year after the Effective Date, Company agrees to continue to pay Consultant, as additional consulting fees, an amount equal to the monthly consulting fees otherwise due it under this Agreement through and including the date which is one year after the Effective Date.

            4.     Compensation.     In consideration of the consulting services to be rendered by Harrison on behalf of Consultant under this Agreement, Company agrees to pay Consultant the gross sum of $10,000 per month, in advance, commencing retroactive to April 1, 2008 and continuing on the first date of each calendar month thereafter throughout the Term; provided, however, that the payment or payments due for April 2008 and possibly May 2008 shall not be paid until such time as Company has raised $200,000 in debt financing and commitments for

HAR 000805

another $300,000 in equity financing from its existing shareholders or their affiliates as provided in Section 11.2. Company shall not be required to pay Consultant any additional consulting fees for any calendar month within the Term if Consultant has provided more than 120 hours of consulting services to Company during such month, unless Company has previously agreed in writing to do so.

     5.    <u>Reimbursement of Expenses.</u> During the Term, Company agrees to reimburse the Consultant for all of Consultant's reasonable out-of-town travel, meals, lodging and other incidental expenses incurred in connection with Consultant's performance of its duties hereunder; <u>provided</u> that the nature and anticipated amount of such expenses have been pre-approved by Company's President and Chief Executive Officer and that appropriate vouchers and/or other proofs of expenditure are provided to, and approved by, Company prior to actual reimbursement thereof, all in accordance with Company's expense reimbursement policies now existing or taking effect from time to time in the future.

     6.    <u>Other Acknowledgements and Agreements by Harrison.</u> By his execution and delivery of this Agreement, Harrison hereby further acknowledges and agrees in favor of Company, as follows:

     (a)    That Harrison shall be deemed to have resigned as the Chairman of the Board of Directors of Company as of the Effective Date (but shall otherwise remain as a director of Company);

     (b)    That Harrison shall be deemed to have resigned as the Manager of the LLC, effective retroactive to April 21, 2006;

     (c)    That Harrison shall be deemed to have permanently and forever waived any and all rights that he might otherwise be deemed to have had under Sections 3.2 and 3.3 of the LLC's Operating Agreement to be employed by the LLC for a minimum period of 12 years from the inception of the LLC's operations and to be paid compensation by the LLC as a result of such employment, effective retroactive to April 21, 2006;

     (d)    That Harrison has no present claims for any accrued but unpaid compensation, consulting fees, fringe benefits, reimbursable expenses or any other known or unknown claims of any kind whatsoever against THI, the LLC or any of their respective officers and directors, employees, representatives, agents, successors and/or assigns which have not been previously paid or released pursuant to the applicable provisions contained in that certain Separation Agreement and Mutual Releases, dated July 31, 2007, among some of the parties to this Agreement;

     (e)    That, except for an automobile lease of a Dodge Nitro (the existence of which has previously been disclosed to Company and the payments for which Harrison hereby indemnifies Company), Harrison has not transferred any property rights of any kind whatsoever relating to Company or to Company's business to any other person with whom Harrison is affiliated (including Consultant, Harrison's spouse and/or Harrison's issue) and that, to Harrison's knowledge, none of such other persons with whom Harrison is affiliated has any claims of any kind whatsoever against Company or any of its officers, directors, stockholders,

members, managers, employees, representatives, agents, successor and/or assign, other than as a result of such persons' ownership of record of Company's common stock; and

        (f)    That Harrison: (i) reaffirms any and all representations, warranties, covenants and agreements previously made by him in that certain Confidential Information and Invention Assignment Agreement, dated April 21, 2006, executed by him in favor of Company and (ii) agrees that such agreement remains in full force and effect after the Effective Date, except to the extent that any of the provisions thereof are in conflict with any of the provisions of this Agreement, in which event the provisions of this Agreement supersede the contrary provisions contained in such agreement. A true and complete copy of such agreement is attached hereto as Exhibit B.

    7.      Inventions.

        7.1    Ownership of Inventions.  The parties to this Agreement agree that the sole and entire right, title and interest in and to any and all inventions, developments, concepts and improvements, whether or not patentable, which Consultant or Harrison may solely or jointly conceive, develop or reduce to practice during the Term, or cause to be conceived, developed or reduced to practice during the Term, relating to Company's business as generally described in the Recitals to this Agreement or Company's current or future research and development in connection with such business (collectively the "Inventions") is and shall be owned by Company.

        7.2    Maintenance of Records.  Harrison agrees to keep and maintain adequate and current written records of all Inventions made by him, solely or jointly with others at Company, relating to Company's business as generally described in the Recitals to this Agreement or its research and development in connection therewith during the Term. Such records may be in the form of notes, sketches, drawings and any other format, whether specified by Company or not. Such records shall be available to, and remain the property of, Company at all times.

        7.3    Patent Registrations.  Harrison agrees to assist Company, or its designee, at Company's sole expense, in securing Company's rights in and to any Inventions and any patents and/or other similar intellectual property rights relating thereto in the United States and any and all foreign jurisdictions. Such assistance shall include disclosure of all pertinent information and data with respect thereto, the execution of all applications, specifications, declarations, oaths, assignments and all other instruments which shall be deemed necessary in order to apply for and obtain such patent or other rights and in order to assign and convey to Company the sole and entire right, title and interest in and to such Inventions and any patents and/or other similar intellectual property rights relating thereto. Harrison further agrees that his obligation to execute, or cause to be executed, when it is in his power to do so, any such instrument or paper shall continue after the end of the Term. If Company is unable, because of Harrison's mental or physical incapacity or for any other reason, to secure Harrison's signature to apply for or to pursue any application for any United States or foreign patents covering any of the Inventions owned by Company as provided in this Section 7, then Harrison irrevocably designates and appoints Company and its duly authorized officers and agents as his agents and attorneys-in-fact to act for and in his behalf and stead, to execute and file any such applications

HAR 000807

and to do all other lawfully permitted acts to further the prosecution and issuance of patents and/or other similar intellectual property rights relating thereto with the same legal force and effect as if executed by him.

      7.4    Exploitation of Inventions. Company shall have the sole right to seek to commercialize and exploit any and all Inventions owned by Company under this Section 7 including, without limitation, the sale of the Inventions and any patents and patent applications thereon or the grant of exclusive licenses thereto to any third person or persons in connection with a sale of Company's business or otherwise, all without the payment of any further consideration of any kind whatsoever to Consultant or Harrison.

      8.    Confidential Information and Nondisclosure Thereof.

      8.1    Definition of Confidential Information. For purposes of this Agreement, the term "Confidential Information" means any information not generally known outside of Company or information entrusted to Company by third parties, and includes information previously or hereafter known to Consultant or Harrison as confidential or secret or which Consultant or Harrison has, or will have, reason to know, or reasonably should know, is confidential or secret. Such Confidential Information may relate, for example, to Company's business or marketing plans, intellectual properties, computer programs, research, development, purchases, accounting, marketing, costs, profits, sales, products, personnel, pricing policies and other business affairs, methods or information not readily available to the public, and plans for future development of Company's business. Confidential Information may be contained in materials such as data reports, agreements, correspondence, customer lists (written or unwritten), supplier lists or specifications or may be in the nature of, or consist of, knowledge, techniques, processes, practices or know-how which are not readily available to the public.

      8.2    Nondisclosure of Confidential Information. Consultant and Harrison acknowledge that, prior to and during the Term, Consultant and Harrison have been given, and will be given, access to, or become acquainted with, Confidential Information relating to Company. Consultant and Harrison agree that such Confidential Information is of great value to Company and further agree not to use or disclose any such Confidential Information in any manner during or after the Term for an indefinite period of time without Company's prior written consent (other than as expressly required for Consultant and Harrison to be able to perform their duties and responsibilities hereunder). Consultant and Harrison further agree that all Confidential Information, whether prepared or conceived by Consultant or Harrison prior to or during the Term or which may be in Consultant's or Harrison's possession or control, is Company's sole and exclusive property, and may be removed from Company's premises only if permitted by Company in accordance with its rules and regulations. Consultant and Harrison agree to immediately return all Confidential Information to Company when no longer required in order for Consultant or Harrison to perform their consulting services on behalf of Company, upon the termination of this Agreement or whenever Company may otherwise require.

      9.    Consultant's Other Negative Covenants. Neither Consultant or Harrison shall, without Company's prior written consent: (i) plan for, acquire any substantial financial interest in or perform any services for compensation for any business or entity competitive with Company (including any business or entity that has a business relationship with Company) during the

480470.3 (T08912.001)          6

Term; provided, however, that Harrison shall be entitled to continue to work on behalf of Consultant's business so long as such work doesn't conflict with his duties under this Agreement and so long as Consultant's business continues not to compete with Company's business; (ii) employ, attempt to employ or solicit for employment by others, any of Company's employees during the Term and for a period of two (2) years thereafter; or (iii) solicit, or cause to be solicited, any of Company's customers or previously-identified prospective customers with respect to the sale of products or services which are competitive with those of Company while retained by, or receiving any consulting fees from, Company pursuant to this Agreement and for a period of three (3) years after the end of the Term, without Company's prior written consent.

       10.     Injunctive Relief.  The parties acknowledge that a breach by Consultant or Harrison of any of the provisions of Sections 8 or 9 of this Agreement, will cause Company great and irreparable harm and that Company will be entitled to injunctive and other equitable relief to prevent a breach thereof, without being required to post any bond therefor, in addition to any other remedies Company may have against Consultant or Harrison. The parties further agree that the provisions of Sections 8 and 9 of this Agreement will be specifically enforceable by Company against Consultant and/or Harrison in accordance with their terms.

       11.     General Provisions.

       11.1    Independent Contractor During Term.  During the Term, Consultant and Harrison shall act solely in a consulting capacity hereunder and, in consequence thereof, shall not have authority to act for Company or to give instructions or orders on behalf of Company or to make any decisions or commitments or to execute any contracts or agreements for or on behalf of Company. During the Term, neither Consultant nor Harrison shall be deemed an employee of Company but shall be deemed to act in the capacity of an independent contractor.

       11.2    Condition Precedent to Enforceability of Agreement.  It shall be a condition precedent to the enforceability of this Agreement on the part of both Company, on the one hand, and Consultant and Harrison, on the other hand, that Company shall have raised at least $200,000 in debt capital and shall have received commitments for an additional $300,000 in equity capital from Company's existing shareholders or their affiliates on or prior to May 31, 2008. If Company is unsuccessful in raising such sums and such commitments by such date, then the provisions of this Agreement shall be deemed to be null and void.

       11.3    Governing Law.  This Agreement will be governed by, interpreted under and construed and enforced in accordance with the internal laws of the State of California.

       11.4    Notices.  All notices, requests, demands and other communications called for or contemplated hereunder will be in writing and will be deemed to have been duly given when: (a) personally delivered; (b) two days after having been mailed by United States certified mail, postage prepaid, return receipt requested; (c) one day following delivery to an overnight courier service properly addressed to the receiving party and confirmed as having been delivered by such overnight courier service; or (d) upon acknowledgment by the recipient of email or facsimile transmission following correct dispatch. All such notices, requests, demands and other communications will be addressed to the parties at the following addresses, or at such other

HAR 000809

addresses as any party may designate by written notice in like manner to the other party or
parties:

| | |
|---|---|
| If to Consultant or Harrison: | Paul W. Harrison<br>5336 Vincent Avenue<br>Los Angeles, California 90041<br>Facsimile: (213) ____-_____<br>Email: mc2paul@aol.com |
| If to Company: | TherMark Holdings, Inc.<br>33 Hammond, Suite 205<br>Irvine, California 92618<br>Attn:  Joel Assaraf, President and CEO<br>Facsimile:  (949) 861-6211<br>Email: joel.essaraf@thermark.com |

     11.5   Assignment.   The rights and obligations of Company under this
Agreement shall inure to the benefit of Company, its successors and assigns, and shall be binding
upon the successors and assigns of Company. This Agreement, being personal to Consultant and
Harrison, cannot be assigned by Consultant or Harrison without the prior written consent of
Company. Any purported transfer or assignment of any of the rights or obligations hereunder by
Consultant or Harrison in violation of the provisions of this Section 11.5 shall be void and of no
force or effect.

     11.6   Entire Agreement; Amendment.   This Agreement represents the entire
agreement of the parties hereto with respect to the subject matter hereof superseding all prior
agreements, understandings, discussions, negotiations and commitments of any kind.  This
Agreement may not be amended or supplemented, nor may any rights hereunder be waived,
except in a writing signed by each of the parties affected thereby.

     11.7   Recovery of Litigation Costs.   If any legal proceeding is brought for the
enforcement of this Agreement, or because of an alleged dispute, breach, default or
misrepresentation in connection with or arising out of any of the provisions of this Agreement,
the successful or prevailing party or parties shall be entitled to recover his, its or their reasonable
attorneys' fees and other costs incurred in such proceeding, in addition to any other relief to
which he, it or they may be entitled.

     11.8   Section Headings.   The Section headings in this Agreement are included
for convenience only, are not a part of this Agreement and shall not be used in construing it.

     11.9   Continuation of Certain Obligations.   Consultant and Harrison agree that
the provisions of Sections 6 through 10 of this Agreement shall continue in full force and effect
after the Term.

     11.10   Severability.  In the event that any provision or any part of any provision
of this Agreement is held to be illegal, invalid or unenforceable, such illegality, invalidity or

unenforceability shall not affect the validity or enforceability of any other provision or part hereof.

    11.11   Counterparts and Exchanges by E-mail or Facsimile.   This Agreement may be executed in counterparts, each of which shall constitute an original and all of which, when taken together, shall constitute one agreement.   The exchange of a fully executed Agreement (in counterparts or otherwise) by e-mail or facsimile shall be sufficient to bind the parties to the terms and conditions of this Agreement.

    IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the date first above written.

            "Company"                                "Harrison"

    THERMARK HOLDINGS, INC.

    By: _____          _____
    Name:  Joel Assaraf                        Paul W. Harrison
    Title:   President and CEO

                                            "Consultant"

                                    PERMANENT IMPRESSIONS, INC.

                                    By: _____
                                    Name:  Paul W. Harrison
                                    Title:   Chief Executive Officer

HAR 000811

**Exhibit F**

## THERMARK STOCK REDEMPTION AND SETTLEMENT AGREEMENT

This Stock Redemption and Settlement Agreement (this "Agreement") is made effective as of the date set forth below (the "Effective Date"), and entered into by and among:

(1) **TherMark Holdings, Inc., TherMark, LLC, Momentum Venture Management, LLC, Matthew Ridenour, Douglas Hayes, Alex Cory and Davis Thompson (collectively, the "TherMark Parties"); and**

(2) **Permanent Impressions, Inc., Paul Harrison, and the following "Represented Shareholders" of TherMark Holdings, Inc.: Claudette Harrison, James Scott, Michael Scott, Patrick Scott, Skylar Scott, Mason Scott, Alexis Scott, William Maybaum, Greer Maybaum, Anthony Russo, Carl Schulthess, Atlasta Specialty Ink. Co., Inc., Charles Harrison, Bruce Brown, Leon Rauch, Jack Blue, Gerald Goff, Allan Lannom, Michael Stover. Permanent Impressions, Inc., Paul Harrison, and the Represented Shareholders shall be collectively referred to as the "Harrison Parties".**

All of the TherMark Parties and Harrison Parties are sometimes referred to herein individually as the "Party" or collectively as the "Parties".

### RECITALS

**WHEREAS**, the background of the disputes between the Harrison Parties and the TherMark Parties is complex and involves many circumstances and documents. These recitals are not intended to be comprehensive in any way in listing such circumstances and documents;

**WHEREAS**, each of the Harrison Parties is the owner of the respective number of shares of the common stock of TherMark Holdings, Inc., as listed on Schedule I (the "Shares");

**WHEREAS**, Paul Harrison on behalf of himself and the Represented Shareholders filed an action in the Los Angeles County Superior Court, Case Number BC426195, and TherMark Holdings, Inc., filed counterclaims (the "Action");

**WHEREAS**, TherMark Holdings, Inc. and TherMark, LLC (collectively, "TherMark") filed a lawsuit against Paul Harrison, Robert Martel, James Scott, Permanent Impressions and TBH, GmbH in the Los Angeles County Superior Court (the "Second Action");

**WHEREAS**, TherMark desires to redeem from the Harrison Parties, and each of the Harrison Parties desires to transfer to TherMark Holdings, Inc., all of the Shares owned by such Harrison Party, and the Parties desire to dismiss the Action and to release one another from any and all claims, upon the terms and subject to the conditions of this Agreement;

1

**WHEREAS**, it is expressly agreed and understood that by entering into this Agreement, the Parties do not admit any liability or responsibility for any claims which may be made by the other, all such liability and responsibility being hereby denied.

### AGREEMENT

In consideration of the foregoing recitals and the mutual covenants contained herein, the Parties, intending to be legally bound, agree as follows:

1. **Dismissal of Entire Action.** Upon successful completion of the initial payment of $190,000 more fully described in Section 10, the parties to the Action shall file a request for dismissal with prejudice as to the entire Action as to all defendants and cross-defendants named in the Action with the lone exception of defendant Clark & Trevithick, who has been dismissed from such action but whose dismissal is presently being appealed by Paul Harrison. Such dismissal shall include all claims against the TherMark Parties assigned to Paul Harrison by the shareholders of TherMark Holdings, Inc. listed on Schedule I hereto (the "Request for Dismissal"). All parties to the Action shall bear their own attorneys' fees and costs.

2. **Dismissal of Second Action.** Within 5 days after the Action is dismissed, TherMark will dismiss with prejudice the parties to the Second Action that are Parties to this Agreement. TherMark is not dismissing Robert Martel from the Second Action, which will remain in full force against Robert Martel.

3. **Full Mutual Release of Any and All Claims.** Paul Harrison and each of the Parties hereby release and forever discharge each of the other Parties and all of such other Parties' affiliates and each of their respective employees, agents, officers, directors, managers, funds, attorneys, shareholders, members, partners and owners from any and all liabilities, claims, demands, actions, causes of action or suits of any kind or nature whatsoever, whether known or unknown, suspected or unsuspected, which each of the Parties now owns or holds, or at any time heretofore has owned or held, against any of the other Parties or the other Parties' affiliates or any of their respective employees, agents, officers, directors, managers, funds, attorneys, shareholders, members, partners and owners (the "Release"). The Release contained in this Agreement does not apply to Robert Martel, and the TherMark Parties are not providing a release for Robert Martel or any other individuals or companies that are not specifically named in this Agreement.

4. **Waiver of Civil Code §1542.** It is the intention of the Parties that the foregoing releases shall be effective as a bar to all actions, causes of action, suits, claims, or demands of

2

03/23/2011  06:27    3104075491              DOUG HAYES                      PAGE  03/03

every kind, nature or character whatsoever, known or unknown, suspected or unsuspected, fixed or contingent. The Parties acknowledge that they have been advised by legal counsel or have had the opportunity to be advised by legal counsel and are familiar with the provisions of California Civil Code §1542, which provides as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO
> CLAIMS WHICH THE CREDITOR DOES NOT
> KNOW OR SUSPECT TO EXIST IN HIS OR HER
> FAVOR AT THE TIME OF EXECUTING THE
> RELEASE, WHICH IF KNOWN BY HIM OR HER,
> MUST HAVE MATERIALLY AFFECTED HIS OR
> HER SETTLEMENT WITH THE DEBTOR."

The Parties expressly WAIVE and relinquish any and all rights or benefits they may have under, or which may be conferred upon them, by the provisions of California Civil Code §1542 to the fullest extent that they may lawfully waive such rights or benefits. The Parties hereby acknowledge that they are aware that they or their attorneys may hereafter discover claims and facts in addition to, or different from, those which they now know or believe to exist with respect to the subject matter of, or any Party to, this Agreement, but that it is nonetheless the intention of the Parties to hereby fully, finally, and forever settle and release any and all disputes and differences, known or unknown, suspected or unsuspected, which the Parties now own or hold, or at any time heretofore have owned or held, against any of the other Parties.



Paul Harrison for Permanent Impressions, Inc.

Paul Harrison as an individual

Claudette Harrison as an individual

Joel Assaraf for TharMark Holdings, Inc.

Joel Assaraf for TharMark, LLC

Matthew Ridenour as an individual

Matthew Ridenour for Momentum Venture Management, LLC

Davis Thompson as an individual

Alex Cory as an individual

Douglas Hayes as an individual



3

**5. Power to Release.** Each of the Parties represents and warrants to the other Parties that such Party is the sole owner of the claims that such Party is releasing, and that such Party has full power to give the release provided for herein. Each of the Parties further represents and warrants to the other Parties that such Party has not assigned or transferred any of the claims released herein other than those claims assigned to Paul Harrison which are being released by Paul Harrison hereby. Should any Party make or assign a claim in whole or in part arising from the same events as the claims that are herein released, such Party shall indemnify and hold the other Parties harmless from and against any liability, loss, cost or expense, including attorneys' fees, incurred as a result of any such claim.

**6. Redemption of Shares.** Contemporaneously with the execution of this Agreement by the Parties, and for consideration provided in this Agreement, each of the Harrison Parties hereby transfers and assigns to TherMark Holdings, Inc., and TherMark Holdings, Inc. hereby redeems from each of the Harrison Parties, all of each of the Harrison Parties' right, title and interest in and to the Shares. The Harrison Parties also hereby transfer to TherMark Holdings, Inc. any other interest of any kind, known or unknown, direct or indirect, in TherMark Holdings, Inc., including but not limited to any options to purchase shares in TherMark Holdings, Inc.

**7. Delivery of Shares, Etc.** Contemporaneously with the execution of this Agreement by the Parties, and for the consideration provided in this Agreement, Paul Harrison and Claudette Harrison shall deliver to TherMark Holdings, Inc.: (1) duly executed assignments in the forms set forth in Schedule III assigning to TherMark Holdings, Inc. all the Shares owned by them, individually or jointly, as separate property or as community property, and the original certificates representing such Shares; and (2) from each of the Represented Shareholders (i) a duly executed signature page to this Agreement (the "Signature Page"), (ii) a duly executed assignment assigning the Shares owned by such Represented Shareholder to TherMark Holdings, Inc. as set forth on the Signature Page, and (iii) any and all original stock certificates evidencing the Shares owned by Paul Harrison and/or Claudette Harrison and each Represented Shareholder. The Harrison Parties are required to deliver all of their Shares and all of the stock certificates representing such Shares. In the event any of the original stock certificate required to be delivered hereunder have been lost or destroyed, the owner of such certificate shall deliver a duly executed affidavit of lost share certificate in the form set forth in Schedule IV in lieu of such stock certificate.

4